GOLDEN PACIFIC BANCORP, et al., Appellant,

v.

Robert L. CLARKE, Acting Comptroller of the Currency, et al.

No. 87–5041.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 6, 1987.

Decided Jan. 26, 1988.

Jerris Leonard, with whom Thomas R. Kline, Kathleen H. McGuan and Charles Emmet Lucey, Washington, D.C., were on the brief for appellant.

Mary K. Doyle, Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and John F. Cordes, Dept. of Justice, Washington, D.C., were on the brief for appellees.

Before EDWARDS, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Golden Pacific Bancorp ("Golden Pacific"), a bank holding company that controlled Golden Pacific National Bank (the "Bank"), appeals the district court's grant of summary judgment to the government. Golden Pacific sought review under the Administrative Procedure Act of the Comptroller of the Currency's action in declaring the Bank insolvent and appointing the Federal Deposit Insurance Corporation as receiver. Appellant also asked for damages against the government under the Federal Tort Claims Act ("FTCA") and the takings clause of the Fifth Amendment. The district court reached the merits of appellant's claim, holding the Comptroller did not act arbitrarily and capriciously. We affirm but do so on grounds that Golden Pacific's action is nothing more than a claim for damages under the FTCA, and that cause of action is not available to appellant.

## I.

On the basis of an informant's tip, the Comptroller began a surprise investigation of the Bank on Monday, June 17, 1985. The Comptroller's examiners discovered that, as the informant had claimed, the Bank had been issuing certificates of deposit, known—because of their color—as "yellow CDs," not recorded on the Bank's books nor available to bank examiners during routine examinations.

The examiners sought to determine whether the yellow CDs were deposits (liabilities of the Bank) or, as Bank officials claimed, merely investments placed with the Bank as agent. If the former, then the Bank was obliged to show offsetting assets; otherwise the Bank's liabilities would exceed its assets and it would be technically insolvent. Based on their physical appearance and the Bank's method of dealing with the yellow CDs, the Comptroller determined they were deposits and thus liabilities of the Bank. The yellow CDs, like standard certificates of deposit, stated a fixed rate of interest, a set maturity date, and bore the Bank's name across the top in block letters. And the yellow CDs were consistently honored upon maturity or, if appropriate, upon demand. Although the Bank claimed the instruments represented investments the Bank made on behalf of the holders, the Bank did not match the "investors' " money with any investments and did not liquidate any investments or portions thereof when the CDs were paid. According to the Bank, the yellow CDs were subject to a form agreement, which stated the instruments were not deposits and that the Bank was not liable for any loss of funds invested by the customer; however, no *signed* agreements were ever produced.

Alternatively, Bank officials claimed the Bank held adequate off balance sheet assets to cover liabilities represented by the over $15 million in yellow CDs. After repeated demands from the examiners throughout the week, on the last day of the examination bank officials turned over the bulk of the documents it claimed verified the corresponding assets: $7.8 million in the Sand Pebbles Realty Co. (a limited partnership with the Bank's president's wife a general partner), 83 unvalued condomin-

iums in Taiwan, $1 million in bankers' acceptances, an unpaid $800,000 construction loan to T & C Realty Co., and $1.1 million in Bank stock. The examiners, however, believed there was insufficient showing to lead them to conclude that *Bank* assets matched the yellow CDs.

By the end of the week, the Comptroller determined the Bank was engaged in unsafe and unsound banking practices, and he was preparing a cease and desist order directing the Bank to stop soliciting or accepting further off balance sheet deposits. Before the order could issue, the examiners learned of a run on the Bank. Apparently, news of the examination had reached the public and the examiners feared the Bank could not meet the expected withdrawals. Faced with this turn of events, the Comptroller declared the Bank insolvent at 10:20 p.m. on the night of Friday June 21, 1985 and placed it in receivership.

## II.

Golden Pacific would have us entertain its challenge to the reasonableness of the Comptroller's actions, but neither the APA nor the FTCA permits us. Appellant asserts that a careful review of all the documentation should have led the Comptroller to conclude that the Bank was in fact solvent and that it had sufficient liquidity to meet depositors' demands.[1] But at oral argument counsel for appellant conceded that the only relief appellant seeks is money damages; no specific relief under the APA is any longer—if it ever was—at issue. Golden Pacific's claim under the APA, it seems to us, serves only as a device upon which to predicate damages for alleged arbitrary and capricious actions of the Comptroller. This, however, appellant cannot do.

One cannot sue the federal government unless one finds a waiver of sovereign immunity. The FTCA, upon which appellant primarily proceeds, authorizes damage suits against the United States for negligent or wrongful acts of its employees but limits such actions by exempting

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused.*

28 U.S.C. § 2680(a) (1982) (emphasis added).

The district court thought this language waived sovereign immunity for even discretionary acts unless some level of "due care" was exercised. *See Golden Pac. Bancorp v. Clarke*, No. 85–2384 (D.D.C. Aug. 22, 1986) [Available on WESTLAW, 1986 WL 13881], *reprinted in* Joint Appendix ("J.A.") at 37, 44. But the due care requirement applies only to the first part of the clause; a claim based upon the exercise of a discretionary function is barred even if discretion is abused. Congress thought "[i]t ... neither desirable nor intended that ... the propriety of a discretionary administrative act should be tested through the medium of a damage suit for tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 809–10, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984) (*"Varig Airlines"*) (quoting *Hearings on H.R. 5373 and H.R. 6463 Before the House Comm. on the Judiciary*, 77th Cong., 2d Sess. 28, 33 (1942) (statement of Assistant Attorney General Francis M. Shea)). Thus the so-called discretionary function excep-

---

1. The appellant also claims the district court granted summary judgment on an incomplete administrative record because the government refused to lodge with the court certain documents turned over to the examiners by bank officers, pending a criminal investigation by the U.S. Attorney's Office in New York City. The government sought and obtained stays of appellant's discovery based on *in camera* filings. We have previously expressed our concern with this procedure employed by the Justice Department. *See Weil v. Markowitz*, 829 F.2d 166, 174 & n. 17 (D.C.Cir.1987), and we do not believe the government entitled to litigate the merits of the Comptroller's actions on an incomplete record because of a pending criminal proceeding. Since we do not reach the merits, however, we have no need of the complete record.

tion to the FTCA reaches all those governmental actions "where there is room for policy judgment and decision." *Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953); *see also Varig Airlines*, 467 U.S. at 819–20, 104 S.Ct. at 2767.

To be sure the Supreme Court has not attempted to "define with precision every contour of the discretionary function exception," *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764, but the actions complained of here seem the very paradigm Congress had in mind in fashioning the exception. Congress has given the Comptroller broad authority to ensure that all national banks follow safe and sound banking practices. 12 U.S.C. § 1818(b) (1982). The Comptroller's determinations as to whether the yellow CDs were to be regarded as liabilities and whether the Bank made an adequate showing of non-booked offsetting assets to cover those liabilities appear to us obvious policy judgments regarding what constitutes safe and sound bank practices. And surely the decision to close the Bank—made after a week of examination and in the face of a run of withdrawals—could not possibly be thought of as other than a discretionary act that was committed by Congress to the Comptroller's judgment. *See* 12 U.S.C. § 191 (1982). "Judicial intervention in such decisionmaking through private tort suits would require the courts to 'second-guess' the political, social, and economic judgments of an agency...." *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. at 2767. That would be so even were a court subsequently to determine as a matter of law that the yellow CDs were not liabilities.[2] The Comptroller, incident to his responsibilities, must make innumerable subtle judgments in describing the content of safe and sound bank practices—judgments that draw upon a mix of law, accounting, bank custom, and policy. Sometimes, as here, those determinations must be made under grave pressure and expeditiously. The government is not liable in damages merely because in a particular case the Comptroller's conclusion or some aspect of it turns out to be legally vulnerable.[3]

The district court believed the discretionary function exception to the FTCA's waiver of sovereign immunity to be somehow affected by the APA's authorization of review of arbitrary and capricious agency action. 5 U.S.C. § 706(2)(A) (1982). The court concluded accordingly that the exception did not apply to *"entirely* arbitrary and capricious action." J.A. at 43 (emphasis added). We have, however, already explained the interrelationship of the two statutes. The government's waiver of sovereign immunity under the APA is much broader than under the FTCA, thus "[u]nder the former statute, it is clear that agency action is reviewable (by injunction, mandamus or declaratory judgment[4]) for abuse of discretion, but under the latter even a *gross abuse of discretion* will not predicate an award of tort damages." *Scanwell Laboratories v. Thomas*, 521 F.2d 941, 948 (D.C.Cir.1975) (footnote added; citation omitted; emphasis added), *cert. denied*, 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976). The district court's formulation, "entirely arbitrary or capricious," is merely another way of describing a "gross abuse of discretion." Nor is *Hatahley v. United States*, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956), relied on by the district court and appellant, to the contrary. There the Supreme Court permitted an FTCA claim against the government because the challenged actions, although ostensibly within the scope of the government's agents' authority, were il-

---

2. The Comptroller's conclusion was actually confirmed by a federal district court in an action brought by the FDIC, which as we indicated, was appointed receiver by the Comptroller. *FDIC v. Holders of Yellow Certificates Nos. 1–367*, No. 85–8164 (S.D.N.Y. Sept. 16, 1986), *reprinted in* J.A. at 78.

3. That is not to say, of course, that the Comptroller's action in closing a bank is totally insu-

lated from judicial review, only that damages under the FTCA are ordinarily not available.

4. Appellant's request for a declaratory judgment serves no purpose other than as a predicate for damages; it cannot thereby circumvent the discretionary exception to the FTCA. *See Ireland v. Shultz*, 829 F.2d 1189, 1192 & n. 5 (D.C.Cir. 1987).

legal on their face and moreover, the court concluded, did not involve a delegated exercise of discretion. *Id.* at 181, 76 S.Ct. at 751.

We do not reach appellant's alternative theory of recovery under the Fifth Amendment because it was first argued only on appeal in appellant's reply brief. As we have stated before, "[c]onsidering an argument advanced for the first time in a reply brief ... is not only unfair to the appellee but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." *McBride v. Merrell Dow & Pharmaceuticals, Inc.*, 800 F.2d 1208, 1211 (D.C.Cir.1986) (citations omitted); *see also Environmental Defense Fund v. Costle*, 657 F.2d 275, 284 n. 32 (D.C.Cir.1981); *United States v. Haldeman*, 559 F.2d 31, 78 n. 113 (D.C.Cir.1976) (en banc) (per curiam), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). We do not "sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before [us]." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983).

Accordingly, the judgment of the district court is

*Affirmed.*