**COLUMBIA GAS TRANSMISSION CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

New Jersey Natural Gas Co., Baltimore Gas & Electric Co., Consolidated Gas Transmission Corp., Virginia Natural Gas, Inc., Washington Gas Light Co., East Ohio Gas Co., Process Gas Consumers Group, Dayton Power and Light Co., Texas Eastern Transmission Corp., Texas Gas Transmission Corp., Intervenors.

No. 87–1260.

United States Court of Appeals, District of Columbia Circuit.

Argued March 3, 1988.

Decided June 3, 1988.

Stephen J. Small, with whom Fredric J. George and Giles D.H. Snyder, Washington, D.C., were on the brief, for petitioner.

John N. Estes, III, Atty., F.E.R.C., with whom Catherine C. Cook, General Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent.

William H. Penniman, Washington, D.C., was on the brief for intervenor, Process Gas Consumers Group. Gail S. Gilman, Washington, D.C., also entered an appearance for intervenor, Process Gas Consumers Group.

Joseph M. Oliver and M. Lisanne Crowley, Washington, D.C., entered appearances for intervenor, New Jersey Natural Gas Co.

J. Thomas Wolfe and Charles A. Herndon, Jr., Baltimore, Md., entered appearances for intervenor, Baltimore Gas and Elec. Co.

Mark G. Magnuson, Washington, D.C., entered an appearance for intervenor, Consolidated Gas Transmission Corp.

Arnold H. Quint and James F. Bowe, Jr., Washington, D.C., entered appearances for intervenor, Virginia Natural Gas, Inc.

Frank H. Strickler and Gordon M. Grant, Washington, D.C., entered appearances for intervenor, Washington Gas Light Co.

Paul T. Ruxin, Richard D. Avil, Jr., Cleveland, Ohio and Linda Gillespie Stuntz, Washington, D.C., entered appearances for intervenor, East Ohio Gas Co., et al.

Robert S. Waters, Richard M. Merriman and Daniel John Regan, Jr., Washington, D.C., entered appearances for intervenor, Dayton Power and Light Co.

Judy M. Johnson, Houston, Tex., entered an appearance for intervenor, Texas Eastern Transmission Corp.

Cheryl L. Jones, Washington, D.C., entered an appearance for intervenor, Texas Gas Transmission Corp.

Before WALD, Chief Judge, and ROBINSON and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

In this petition for review, Columbia Gas challenges the Federal Energy Regulatory Commission's ("FERC's") denial of its application for an individual section 7(c) certificate to transport natural gas at a selective discount. *See* 15 U.S.C. § 717f(c) (1982). Although Columbia currently holds a blanket certificate under FERC's Order No. 436, which explicitly permits selective discounting in return for subjecting a transporter of gas like Columbia to certain competitive safeguards, Columbia nevertheless argues that it is entitled to an exception to the generally recognized rule that selective discounting is not permitted

under § 7(c) certificates. We believe FERC's denial of Columbia's request was not arbitrary and capricious, accordingly we deny the petition for review of the Commission's decision.

I.

Columbia's proposal to carry natural gas into the Baltimore/Washington area at a selective discount arose out of a plan by Consolidated Gas to deliver up to 60,000 decatherms ("Dth")[1] of natural gas per day to two local distribution companies, Washington Gas Light Co. ("WGL") and Baltimore Gas & Electric Co. ("BG & E"). Consolidated, since its pipelines stopped short of the Baltimore/Washington area, sought FERC's authority to transport its gas through another pipeline part of the way and then, for the balance of the trip, through new interconnection facilities, which would cost WGL and BG & E $25 million to build. *See Consolidated Gas Transmission Corp.*, 36 F.E.R.C. ¶ 61,273, at 61,660–62, 61,670 (1986). Columbia, asserting it could transport the gas from Consolidated's pipelines to WGL and BG & E at a cheaper price without construction of an allegedly duplicative facility, intervened in opposition to Consolidated's application for a certificate of public convenience. The Commission never had to resolve the dispute because all four parties—Consolidated, Columbia, WGL, and BG & E—reached a negotiated settlement: Columbia agreed to carry Consolidated's gas into Baltimore/Washington at a rate of 8.5 cents/Dth for at least 10 years, a rate so attractive that Consolidated, WGL and BG & E agreed to scuttle the proposed $25 million project.

Columbia, in order to proceed with its proposal, needed legal authority to carry Consolidated's gas. Columbia ostensibly was faced with two choices. It could either petition FERC for individual certification under section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c) (1982), or operate under

---

1. A decatherm is a measure of gas based upon its heat content; one decatherm is equal to one thousand cubic feet ("Mcf") of gas with the standard heat content. A typical single-family residence requires approximately one Mcf of gas per day for heating in cold weather. *See generally* R. Pierce, G. Allison & P. Martin, Economic Regulation: Energy, Transportation and Utilities, at 456 (1980).

its blanket section 7(c) certificate previously granted pursuant to FERC's Order No. 436, 50 Fed.Reg. 42,408 (1985) (codified at scattered sections of 18 C.F.R.) *partially reversed and remanded, Associated Gas Distributors v. FERC,* 824 F.2d 981 (D.C. Cir.1987) ("*AGD*"), *cert. denied sub nom., Southern Cal. Gas Co. v. FERC,* —— U.S. ——, 108 S.Ct. 1469, 99 L.Ed.2d 698 (1988). When the relative advantages of each course of action are explained, it becomes quite understandable why Columbia chose to seek an individual certificate and also why FERC ultimately refused.

Traditionally, FERC has authorized pipelines to transport gas by issuing a § 7(c) certificate of public convenience and necessity for each individual transaction. In this fashion, FERC has monitored significant actions by interstate pipelines, generally requiring that the rate charged reflect the full costs attributable to the transaction. FERC's typical concern is that a pipeline will charge a lower rate, or discount to one customer in its system and make up the difference vis-a-vis another. Because rates are established at the outset of the project and can be adjusted midstream if the pipeline finds it is not recovering its costs, FERC has been, over the years, especially attentive to the possibility that discounting would lead to discriminatory pricing. *See, e.g., Transcontinental Gas Pipe Line Corp.,* 28 F.P.C. 979, 983 (1962). Under individual section 7(c) authority, pipelines historically functioned as merchants, who purchased natural gas from third parties and then transported it for resale. But the Commission found that the interstate pipeline network was not running efficiently because interstate pipelines retained market power in the transportation of gas and generally declined to transport gas in competition with their own sales, thus discriminating in the transportation of gas to the detriment of consumers. *See AGD,* 824 F.2d at 993–96.

FERC responded with Order No. 436, designed to meet both these concerns and the growing need for increased flexibility so pipelines could take advantage of rapidly developing business opportunities without the regulatory delay and constraints arising out of individual § 7(c) certificates. *Id.* at 996. FERC's Order 436 was essentially an effort to facilitate the "unbundling" of pipeline services and product by encouraging pipelines who previously acted only as gas merchants to act also as pure transporters of third-party gas, even though they would thereby compete with their own products. *AGD,* 824 F.2d at 994. In return for the heightened flexibility offered to a holder of a blanket certificate, which authorizes transportation services generically and the right to discount selectively, *id.* at 996, FERC imposed several obligations on the transporter. The most important is the requirement that the pipeline operate under a rate system that is designed to maximize the nondiscriminatory transportation of gas as well as hold the pipeline's shareholders accountable for business decisions, like selective discounts, in order to ensure reasoned behavior from the pipeline. *See generally* Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, [1982–1985 Transfer Binder, Regulations Preambles] Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 30,665, at 31,-533–49 (Oct. 9, 1985) ("Preamble").

FERC thus allocated to the pipelines the risk of the success or failure of their market participation—not always the case before Order 436. FERC's key innovation in Order 436 was to shift the focus from setting transportation rates based on what the pipeline had carried in the past to projections of what the pipeline would carry in the future. FERC thus sets a one-part volumetric rate based on a projection of the volume of gas that can reasonably be expected to be transported through the pipeline's system. *See* 18 C.F.R. § 284.7(d)(2). Then, the pipeline must estimate its fully allocated cost of service for transporting this volume. *Id.* § 284.7(d)(2)–(4); Preamble at 31,535. With these two numbers, FERC establishes what the pipeline's fully based cost per unit of volume will be. For example, if a pipeline intends to carry 1,000 Dth through its pipeline, and total costs will be $500, then the rate will be simply $0.50 per Dth. This rate, also known as the "maximum," will achieve full recovery

of costs for a transporter if it meets its projected volume. Pipelines, like Columbia, are also permitted to charge less than the "maximum" under Order 436 as long as the rate falls within a previously approved rate band. This price band stretches from the "maximum" to the "minimum"; the latter is that rate which, when multiplied by the projected volume, will equal the pipeline's short-term average variable costs. Columbia's rate band runs from a maximum of 42 cents to a minimum of 4.5 cents/Dth.

Unlike the old rates, the new Order 436 one-part rate has no flat "demand charge" that guarantees the pipeline revenue, although the Commission does allow a "reservation charge" to discourage customers from overbooking transportation capacity. Preamble at 31,536–37; *AGD*, 824 F.2d at 1007–08; *see also* 18 C.F.R. § 284.7(d)(1) (1987). There is then an obvious incentive under Order 436's rate structure for a pipeline to carry as high a volume of gas as possible. A pipeline is always encouraged to carry *more than* its projected volume, for that may yield the pipeline (and its shareholders) an overrecovery, or profit above its fully based costs. Of course, carrying less than the projected volume will result in an underrecovery.[2]

In 1986 Columbia accepted a blanket certificate under Order 436, and soon after, FERC accepted Columbia's rate filing, which set a fixed price band for the next three years. *Columbia Gas Transmission Corp.*, 36 F.E.R.C. ¶ 61,166 (1986); *see also* Preamble at 31,537. By doing so, Columbia contends it reserved the option of proceeding under an individual certificate, which is exactly what it seeks here. Because of its presumed ability under an individual section 7(c) certificate to file for an adjustment in its rates if it does not meet

its total costs of service, Columbia sees an advantage to discounting under an individual certificate as compared to a blanket certificate pursuant to Order 436, which, as we have noted, permits no guarantee of recovery of a shortfall from discounting.

FERC, however, denied Columbia's proposed discounted service under § 7(c) as inconsistent with cost-based rate-making principles and concluded that if offered, it should be done through Columbia's blanket certificate under Order 436. *See Consolidated Gas Transmission Corp.*, 36 F.E.R.C. ¶ 61,273, at 61,670 (1986). FERC believed there to be too big a danger of cross subsidization, *i.e.*, forcing possibly captive customers, like the Dayton Power & Light Co. (who protested to FERC) to pay through an increase in their own rates for the discount offered by Columbia to others. *Id.* On rehearing, FERC reiterated its position that for Columbia's proposal to be fully cost justified, its rate would have to equal its "maximum" rate of 42 cents, recently established in Columbia's Order 436 rate proceeding. *Consolidated Gas Transmission Corp.*, 39 F.E.R.C. ¶ 61,112, at 61,-422–23 (1987). The short-haul nature of the proposed transportation from Consolidated's pipeline into Baltimore/Washington (73 and 38 miles respectively) did not affect FERC's view. To the extent there was a savings from carrying the gas over such a short distance, FERC reasoned, it should be shared by all customers throughout the system, not just WGL and BG & E.

Columbia twice sought a clarification from FERC to the effect that the pipeline would not be prejudiced by its decision to carry gas at a discount of 8.5 cents/Dth even if Columbia chose to transport the gas in the future to WGL and BG & E under its Order 436 blanket certificate. FERC treated Columbia's petitions for clarification as

---

**2.** The pipeline has an incentive to discount its price if it thinks it necessary to hold onto (or get more) transportation business, for even if the pipeline charges less for some transported gas, it could still reach its fully based cost, or even go above it, by carrying more than its projected volume. To continue our example, if a pipeline charges 25 cents/Dth where its maximum was 50 cents/Dth, it could still reach its fully based costs of $500 by carrying 2000 Dth (1000 Dth

more than its projected volume of 1000 Dth). Selective discounting then can make sense even if the pipeline does not always expect to reach its fully based costs on each amount transported. In that case, it is better to have carried some gas at a less-than-maximum rate than no gas at all because recovery is pegged to the volume of gas transported. *See, e.g.,* Preamble at 31,545 (hypothetical).

an attempt to opt out of the 436 regime, which, as we have said, is premised on the carrying pipeline's necessarily being held to the risk of underrecovery for its discounting. *Consolidated Gas Transmission Corp.*, 39 F.E.R.C. ¶ 61,259, at 61,865 (1987). Therefore, FERC refused to guarantee that in future 436 rate proceedings the Commission would not include the units of gas transported to WGL and BG & E in Columbia's projected volume. If those units were included in a new projected volume, then the new maximum rate, as Columbia fears, might be affected thereby.[3] Indirectly, then, Columbia might bear the risk of underrecovery in the *new* Order 436 rate design of its proposed discounted service. The Commission further concluded that although Columbia's proposed discount fell within its currently effective Order 436 rate band, FERC could not "presume ... that the rate paid by BG & E and WGL should remain unchanged if Columbia's Order No. 436 transportation rates change." *Consolidated Gas*, 39 F.E.R.C. at 61,423. Columbia petitions this court for review of all three FERC orders.

## II.

FERC typically has refused to authorize selective discounting under individual section 7(c) certificates. It is thus not surprising that petitioner can point to only one case in which FERC has ever permitted a selective discount in an individual § 7(c) certification, *Texas Gas Transmission Corp.*, 41 F.E.R.C. ¶ 61,273 (1987), and we find that one exception readily distinguishable. FERC allowed a discount in *Texas Gas* to help relieve Texas Gas's liabilities to Texaco under long-term take-or-pay contracts, a particularly vexing problem in the natural gas industry with which we have expressed our own concern. *AGD*, 824 F.2d at 1021–30; *see also id.* at 1045 (Mikva, J., concurring). FERC, recognizing the peculiarity of the take-or-pay issue, imposed strict conditions on its approval of the *Texas Gas* individual § 7(c) certificate,

requiring that the "term of the transportation for Texaco [be] limited to the earlier of one year or until Texas Gas accepts a certificate pursuant to [Order 436]," under which Texas Gas would be able to discount (albeit with the risk of underrecovery) if it so chooses. 41 F.E.R.C. at 61,699. FERC's view that the take-or-pay problem is "uniquely different" and deserves a limited exception where "the discount is an integral part of a substantial take-or-pay settlement" is quite reasonable and is sufficient to distinguish this case from *Texas Gas*. *See id.* at 61,700 & n. 11.

FERC's judgment that permitting a § 7(c) discount here would have led to cost shifting was, moreover, supported by substantial evidence. The Commission had only recently finished its rate setting for Columbia pursuant to its 436 blanket certificate and the maximum rate set therein is 42 cents, by definition, the only rate that accurately reflects the fully cost-based rate. Columbia's 8.5 cents/Dth proposal—20% of its "maximum"—does not. That Columbia's proposal arose out of a negotiated settlement is by no means dispositive, as petitioner suggests, of its propriety. As long as FERC's rejection of the settlement is reasonable, the Commission is fully within its authority. *Cf. Tennessee Gas Pipeline Co. v. FERC*, 824 F.2d 78, 82 (D.C.Cir. 1987).

FERC has in fact long sought to prevent the threat of pipelines setting discriminatory rates and practices, *see, e.g., Louisiana Power & Light Co. v. FPC*, 526 F.2d 898 (5th Cir.1976); *Transcontinental Gas Pipe Line Corp.*, 28 F.P.C. 979, 983 (1962); Preamble at 31,541–43, and the Commission is well within its statutory authority under 15 U.S.C. § 717c to ensure that "[n]o natural gas company shall ... grant any undue preference or advantage ... or subject any person to any undue prejudice or disadvantage, or ... maintain any unreasonable difference in rates." To be sure, FERC has in the past permitted "incremental pricing,"

---

**3.** That depends, of course, on what attributed costs of the discounted service are carried over to the new rate proceeding.

in which the costs for a particular project are assigned to the one customer who needs the project as opposed to all customers on the line who cannot benefit from the new facility. *See, e.g., Tennessee Gas*, 824 F.2d at 80–81. But Columbia misunderstands incremental pricing by suggesting that it is an example of FERC's allowing a non fully cost-based method of setting rates. Rather, it is simply another form of a fully cost-based rate, like rolled-in pricing, for example, in which the customer pays for an average of the overall costs on the entire system. *See id.; ANR Pipeline Co. v. FERC*, 771 F.2d 507, 510–11 (D.C. Cir.1985) (per curiam).

 Columbia also alleges that FERC did not fully consider that its proposed transportation of gas would have been over relatively short distances—38 miles to Washington and 73 miles to Baltimore. Out of this alleged error, Columbia fashions two related arguments: FERC acted arbitrarily when it denied Columbia a full evidentiary hearing without considering the allegedly lower costs of such short transportation, and FERC did not have substantial evidence to conclude that Columbia's proposed rate of 8.5 cents/Dth was not fully cost based given that the actual costs of transportation would be considerably less over a short distance. Neither argument is properly before this court because Columbia itself did not raise the short-haul issue before FERC at the administrative level. FERC did respond to this argument—raised however by *Consolidated* —in its second opinion, 39 F.E.R.C. ¶ 61,112, finding that Columbia's 42–cent rate would be the only fully cost-based rate, and further that to the extent Columbia realized savings because of the short haul, Columbia should discount uniformly to all of its § 7(c) customers, not just one.

In *Asarco, Inc. v. FERC*, 777 F.2d 764, 773–74 (D.C.Cir.1985), we explained that under section 19 of the Natural Gas Act, this court may not consider an objection not raised by petitioner but argued to FERC by another party to the same proceeding. *See also New Jersey Zinc v. FERC*, 843 F.2d 1497, 1503 (D.C.Cir.1988). We therefore may not entertain Columbia's argument—in either form—that FERC inadequately considered the short-haul nature of the transportation.[4]

In sum we conclude that FERC's essential position is quite reasonable. Columbia could offer WGL and BG & E the discounted transportation service of 8.5 cents/Dth *under Order 436* as long as it follows the explicit rules of that regime. Columbia's § 7(c) application, with its proposed selective discount, is an effort to circumvent the Order 436 safeguards, which are carefully crafted to permit pipelines like Columbia to selectively discount without raising the danger that captive customers subsidize the discount through higher, discriminatory rates. If allowed, Columbia would run its gas to WGL and BG & E "off book"—to borrow an accounting phrase—by segregating a specific portion of the volume and return on cost, free from Order 436's requirement that the pipeline be held responsible for any underrecovery. Because under section 7(c) Columbia can file for an adjustment in its rates for those customers being served throughout its system, Columbia would not bear the risk of its discount; instead, its other customers would. *Compare* 18 C.F.R. § 284.7(d)(5)(iii) (prohibits pipelines from filing adjustment if they operate under Order No. 436). To allow Columbia to so manipulate its 436 authority would seriously compromise the Commission's efforts to give pipelines the freedom to discount while at the same time protecting against discriminatory pricing.

4. Columbia's argument for a full evidentiary hearing is also based on the alleged benefits of the discount. But Columbia is merely trying to force FERC to reconsider its judgment on the merits through an evidentiary hearing. Contrary to Columbia's belief, a new hearing is not required of "all" section 7(c) hearings. Such a hearing is never mandated unless material issues of fact are raised. *See Consolidated Oil & Gas, Inc. v. FERC*, 806 F.2d 275, 279–80 (D.C.Cir. 1986); *Cerro Wire & Cable Co. v. FERC*, 677 F.2d 124, 128–29 (D.C.Cir.1982); *cf. Southern Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C.Cir. 1988). And Columbia has raised none here.

Finally, Columbia renews its contention that FERC is obliged to clarify how it will treat Columbia's *future* rate proceedings under Order 436. Columbia objects to the tone of FERC's opinion, which implies that Columbia will *necessarily* have to assume any negative consequence that should flow from its discount: "[T]he difference between the costs *actually* recovered and those that would have been recovered if the pipeline *could* have charged the ceiling price ... comes out of the shareholders' pockets if there is any underrecovery." *Consolidated Gas,* 39 F.E.R.C. at 61,865 (emphasis in original) (quoting Order 436). In effect, Columbia wants a guarantee that it will not suffer losses because of its proposed discounted service. But here too Columbia's argument is not properly presented to this court. By not arguing this issue in its opening brief, petitioner has waived its right to argue it on appeal, and we will not entertain this issue even though petitioner argues it in its reply brief. *Golden Pacific Bancorp v. Clarke,* 837 F.2d 509, 513 (D.C.Cir.1988) (citing *Carducci v. Regan,* 714 F.2d 171, 177 (D.C. Cir.1983)).[5]

Columbia's petition for review is therefore

*Denied.*

---

5. Yet another reason that we do not reach this issue is that Columbia's argument is probably not ripe until Columbia's next ratemaking proceeding when the Commission will take a hard look at the pipeline's costs and volume estimates. We do note, however, that the Commission's opinions did not foreclose FERC's future consideration of whether Columbia's transportation rate of 8.5 cents/Dth is fully cost justified because of the short haul involved. Nor did they exclude the possibility that it might be necessary, under some circumstances, to adjust projected volumes to reflect the impact that discounts might cause in driving up demand. *See AGD,* 824 F.2d at 1012; Brief of Respondent at 37.