916 F.2d 1051
 59 USLW 2330
 FEDERAL DEPOSIT INSURANCE CORP., Plaintiff,
v.
William K. IRWIN, Shirley N. Irwin, and Glynn Bell,
Defendants-Third Party Plaintiffs-Appellants.
and
McLEAN AMERICAN BANCSHARES, INC., Third-Party Plaintiff-Appellant,
v.
UNITED STATES of America, Third-Party Defendant-Appellee.
 No. 89-1820.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 13, 1990.
 
 John Mozola, Vicki Wilmarth, Sprouse, Mozola, Smith & Rowley, Amarillo, Tex., for defendants-third party plaintiffs-appellants.
 Freddi Lipstein, Anthony J. Steinmeyer, U.S. Dept. Justice, Washington, D.C., Marvin Collins, Fort Worth, Tex., for third-party defendant-appellee.
 Appeal from the United States District Court for the Northern District of Texas.
 Before CLARK, Chief Judge, REAVLEY and KING, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 The Office of the Comptroller of the Currency ("OCC") declared American National Bank in McLean, Texas ("McLean Bank") insolvent and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. FDIC brought suit against directors of the bank for breach of fiduciary duties. The directors counterclaimed against the United States under the Federal Tort Claims Act ("FTCA"), alleging an improper determination of insolvency. The district court dismissed the counterclaims for lack of subject matter jurisdiction, holding that the determination of insolvency and the decision to close the bank were discretionary acts and thus protected by the discretionary function exception to the FTCA. That counterclaim dismissal presents the only issue before us in this appeal, the other claims having been resolved. We affirm the judgment of the district court.
 
 I.
 
 2
 OCC closed McLean Bank on August 16, 1984. The facts of this regrettably commonplace event reach us because directors of the bank and stockholders of the bank's holding company[1] claim that the closing was unfair.
 
 
 3
 In late 1983, OCC examined McLean Bank and determined that its condition was "unacceptable" and deteriorating. OCC cited violations of legal lending limits, the "lack of adequate Board supervision and failure to adjust lending philosophies to what current economics would dictate." OCC accordingly issued a cease and desist order in February of 1984.
 
 
 4
 OCC conducted a follow-up examination in July of 1984. The examiner, John Chopel, determined that a number of McLean Bank's loans were uncollectible and classified them as loss assets. Chopel made a preliminary determination that McLean Bank's liabilities exceeded its assets and that the bank was thus "book insolvent."[2] OCC's Dallas district office reviewed and confirmed Chopel's findings. OCC officials in Washington also reviewed the findings. OCC closed McLean Bank though it appeared insolvent by a relatively small amount. FDIC was appointed receiver.
 
 
 5
 FDIC then brought suit against William Irwin and other members of the board of directors (collectively "Irwin"), alleging breach of fiduciary duties. Irwin filed a third-party action against the United States under the Federal Tort Claims Act, 28 U.S.C. Secs. 1346(b), 2671-2680. Irwin contends that OCC unlawfully closed McLean Bank when the bank was still solvent, that the examiner reached his insolvency determinations based on personal animosity rather than the bank's financial condition, and that the examiner's superiors simply rubber-stamped his findings.
 
 
 6
 The parties eventually settled FDIC's breach of fiduciary duty claims. The U.S. Attorney moved to dismiss Irwin's claim against the United States, contending that the Comptroller's decision was protected by the discretionary function exception to the FTCA. The district court granted the motion, concluding that the determination of the bank's insolvency and the decision to close the bank are protected discretionary functions. 727 F.Supp. 1073. We affirm.
 
 II.
 
 7
 The FTCA establishes a limited waiver of the federal government's sovereign immunity, rendering the government liable for certain torts "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. Sec. 2674. The discretionary function exception to the FTCA retains sovereign immunity from:
 
 
 8
 (a) Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
 
 
 9
 28 U.S.C. Sec. 2680(a).
 
 
 10
 The drafters of the FTCA failed to define the term "discretionary function," and decades of litigation have yet to yield a clear demarcation between actionable torts and immune discretion. See United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984) (impossible to define precisely every contour of the exception). Imprecision appears inevitable, yet we recognize our duty to interpret the FTCA and its exceptions with fidelity to the dual objectives embodied therein: (1) liberal provision of a more expedient forum than private bills in Congress for redress of injuries and (2) protection of "certain governmental activities from exposure to suit by private individuals." See id. at 808, 104 S.Ct. at 2761.
 
 
 11
 Federal law authorizes the Comptroller to appoint a receiver for an institution "whenever the Comptroller shall become satisfied of the insolvency of a national banking association." 12 U.S.C. Sec. 191. The Comptroller became satisfied of McLean Bank's insolvency and accordingly appointed a receiver. Irwin contends, however, that the insolvency determination was improper and that the decision to close the bank thus triggered FTCA liability. Resolution of Irwin's claim thus depends on "whether the manner and method of determining" a bank's solvency "involves agency judgment of the kind protected by the discretionary function exception." Berkovitz By Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 1963, 100 L.Ed.2d 531 (1988) (footnote omitted).
 
 
 12
 Whether the insolvency determination involves protected agency judgment in turn depends on "whether the challenged acts of a Government employee--whatever his or her rank--are of the nature and quality that Congress intended to shield from tort liability." Varig Airlines, 467 U.S. at 813, 104 S.Ct. at 2764. We conclude that Congress intended to shield the Comptroller's insolvency determinations from tort liability.
 
 
 13
 Congress endowed the Comptroller with "broad authority to ensure that all national banks follow safe and sound banking practices." Golden Pacific Bancorp v. Clarke, 837 F.2d 509, 512 (D.C.Cir.), cert. denied, 488 U.S. 890, 109 S.Ct. 223, 102 L.Ed.2d 213 (1988).[3] This broad grant of authority, and the scant legislative direction thereafter, disables Irwin from citing any statutory or regulatory violation that would lift this case cleanly outside the discretionary function exception. See Berkovitz, 108 S.Ct. at 1957-58 (no discretion to violate specific mandate).
 
 
 14
 The FTCA also imposes liability for actions that are outside specific statutory or regulatory mandates but nevertheless operational in nature. See id. at 1959 (exception "protects only governmental actions and decisions based on considerations of public policy"); Indian Towing Co. v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955) (decision to undertake maintenance of lighthouse discretionary but failure to maintain lighthouse in good condition did not involve permissible exercise of policy judgment). The Comptroller's actions in this case cannot be characterized as the kind of operational conduct that properly subjects the United States to tort liability. Congress committed the multiple policy considerations of banking supervision to the sound discretion of the Comptroller. Specifically, determinations of assets and liabilities involve "obvious policy judgments regarding what constitutes safe and sound bank practices," and these judgments "draw upon a mix of law, accounting, bank custom, and policy" which properly shield the Comptroller from tort liability. Golden Pacific, 837 F.2d at 512. The decision to close a bank would seem the paradigm discretionary act committed by Congress to the Comptroller's judgment. Id.
 
 
 15
 Congressional intent to insulate the Comptroller's decisions from tort liability becomes more evident in the general legislative context of banking regulation. The broad power that Congress provided bank regulatory agencies facilitates a flexible response to the complex and rapidly changing circumstances of banking activity. Congress desired swift regulatory disposition of failed institutions. Woods v. Federal Home Loan Bank Bd., 826 F.2d 1400, 1407 (5th Cir.1987), cert. denied, 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988). Freedom from the specter of tort liability best serves the decisive regulation needed to secure the integrity of the banking system, particularly at the threshold stage of an insolvency determination, sometimes "made under grave pressure and expeditiously." Golden Pacific, 837 F.2d at 512.
 
 
 16
 Even those cases recognizing a limited cause of action for negligent operation of a bank nevertheless consider the declaration of insolvency exempt from tort scrutiny.[4] See Gaubert v. United States, 885 F.2d 1284, 1289 (5th Cir.1989) (FHLBB loses protection of discretionary function exception if it goes beyond discretionary acts and begins day-to-day management of a financial institution), cert. granted, --- U.S. ----, 110 S.Ct. 3211, 110 L.Ed.2d 659 (1990);[5] In re Franklin Nat'l Bank Sec. Lit., 445 F.Supp. 723, 735 (E.D.N.Y.1978) (both chartering and declaring national bank insolvent discretionary but negligent operation not within exception).
 
 
 17
 The government's immunity in this case rests on the protected discretion of the Comptroller even though Irwin complains of tortious conduct by the Comptroller's subordinates. Examiner Chopel's acts were only one phase of the agency's examination and review process that culminated in the protected decision. See Dalehite v. United States, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953) (acts of subordinates in carrying out government operation according to official directions not actionable). See also Emch v. United States, 630 F.2d 523, 528 (7th Cir.1980) (allegations of "numerous 'mistakes, errors, and omissions in the course of examining' the bank and its holding company ... fall facially within the exception"), cert. denied, 450 U.S. 966, 101 S.Ct. 1482, 67 L.Ed.2d 614 (1981).
 
 
 18
 "Federal examination of national banks was designed to provide the Comptroller with information necessary to perform his regulatory function" Harmsen v. Smith, 586 F.2d 156, 157 (9th Cir.1978). Chopel's examination of McLean Bank, performed pursuant to OCC direction and while in regular consultation with that office, was incident to the Comptroller's protected discretionary authority. Only the Comptroller's final decision damaged Irwin's financial interests, and no prior act or acts could have so caused the damage that Irwin cites in his complaint without the ultimate declaration of insolvency. The record indicates that Chopel's findings, whatever their original animus, were tested and refined by the agency's review process. Indeed OCC's review panel reclassified some of Chopel's loan assessments less favorably to the bank, and ultimately concluded that McLean Bank was worse off than Chopel had found.
 
 
 19
 We decline to examine the examiner for error. OCC already performed that function. If an examiner's finding of insolvency absolutely precipitated bank closure, then the controlling judgment would rest with the examiner and our exemption inquiry would shift to the nature of the examiner's conduct. But Chopel's report concerning McLean Bank's insolvency simply triggered further analysis and did not include any recommendation as to whether that institution should be closed. Nor could any of Chopel's findings or recommendations bind the Comptroller to a particular course of action.
 
 
 20
 Irwin contends that the various levels of OCC review constituted "rubber-stamping" of the examiner's findings. But the record indicates that the OCC review process involves analytical rigor of the kind that we cannot fairly recast as blind administrative automation. Both the regional panel of examiners[6] and the Special Supervision Division of the OCC in Washington D.C. reviewed Chopel's findings. These reviews probed Chopel's loan classifications, conclusions, and fidelity to agency guidelines.
 
 
 21
 Irwin's contention that institutional bias skews the review process in favor of the examiner's findings simply employs the language of advocacy to highlight an ordinary characteristic of administration. Irwin adduces nothing to suggest some peculiar OCC habit of slavish acquiescence to reckless field reports. Some deference properly inheres in the process. While review procedures minimize reliance on erroneous findings, fact-finding agencies must accord some deference to their initial fact-finders or they would waste their limited resources forever reinventing the wheel. Nothing in the record justifies imposing tort liability on the Comptroller's process for making solvency and closure determinations, and we reject Irwin's claim of actionable "rubber-stamping."
 
 
 22
 The judgment of the district court is therefore AFFIRMED.
 
 
 
 [1]
 McLean American Bancshares, Inc. owned all of the outstanding stock of McLean Bank. Appellants William K. Irwin, Shirley N. Irwin, and Glynn Bell owned all outstanding stock of McLean American Bancshares
 
 
 [2]
 Two types of insolvency predominate. If a bank cannot meet its obligations to its depositors or creditors, this absence of liquidity, which may manifest through a "run" on the bank, renders it insolvent. Second, a bank may become "book insolvent" when its liabilities exceed its assets, as when identified losses extinguish a bank's capital and reserves
 
 
 [3]
 Irwin would evade the reasoning of Golden Pacific by distinguishing the "liquidity insolvency" in that case from the "book insolvency" in this case--see supra note 2--but suggests no principled basis for that distinction. Book insolvency permits a more orderly transition of a failed bank into receivership, and precisely for that reason may require swift disposition to avoid the graver damage of a liquidity crisis, but otherwise involves the same exercise of discretion with reference to the same range of policies as liquidity insolvency
 
 
 [4]
 We do not of course hold that the Comptroller's action in closing a bank is completely insulated from judicial review, only that courts will not allow prospective tort liability to encumber solvency determinations. An insolvency and receivership determination that is arbitrary, capricious, or an abuse of discretion is reviewable under the Administrative Procedure Act. See, e.g., Woods, 826 F.2d at 1406. Even tort damages may be available if the Comptroller makes a declaration of insolvency knowing that a bank is solvent. Such caprice would not enjoy the protection of the discretionary function exception. See Payton v. United States, 679 F.2d 475, 481 (5th Cir. Unit B 1982) (decision to grant or deny parole within complete discretion of parole board but board cannot ignore required steps of decisionmaking process). Here, Irwin does not contend, and no evidence suggests, that the Comptroller knew McLean Bank was solvent and nevertheless declared it insolvent
 
 
 [5]
 Both parties assert that Gaubert supports their position. Nothing in Gaubert conflicts with our holding and rationale here. We do not, however, rely on the particulars of its analysis pending its review by the Supreme Court. See Federal Deposit Ins. Corp. v. Mmahat, 907 F.2d 546, 552 n. 7 (5th Cir.1990)
 
 
 [6]
 The regional office panel that formally reviewed Chopel's findings consisted of three national bank examiners, a field office manager, and an analyst. These reviewers were apparently selected by Charles Stuart, who no longer works for OCC but was then Chopel's supervisor and director of bank supervision in the southwest for OCC. Stuart testified for Irwin concerning Chopel's volatility, and presided over the peer review meeting. Irwin feels justifiable satisfaction in securing an insider witness, yet Stuart's suspicions of Chopel, coupled with his participation in the review of Chopel's findings, tend to belie the contention that OCC simply rubber-stamped Chopel's allegedly erroneous findings