ROSENBAUM, Circuit Judge:
With the 1937 opening of Florida’s only cross-state water channel, the Okeechobee Waterway (the “Waterway”), boats could reach the Gulf of Mexico from the Atlantic Ocean without going around the southern tip of Florida. Besides saving distance and time, the channel allowed smaller vessels to avoid uncertain sea conditions offshore.
Plaintiff-Appellants Florida Wildlife Federation, Inc., Environmental Confederation of Southwest Florida, Inc., and Conservancy of Southwest Florida, Inc., (collectively, “Conservationists”), complained about serious environmental problems in this channel and the surrounding areas where Lake Okeechobee’s waters flow. They asserted that decisions by Defendant-Appellee U.S. Army Corps of Engineers (the “Corps”) about when and how to release water from certain locks along the Waterway violate the Clean Water Act and Florida law because they negatively affect the quality of the waters the Corps regulates.
In response, the Corps invoked sovereign immunity, and the district court dismissed the Conservationists’ complaint on that basis. The Conservationists now appeal.
But they aren’t the only ones. The South Florida Water Management District (the “Water District”), an agency of the State of Florida, also appeals the judgment. It does so, though, on the basis that the district court first should have decided whether the Conservationists failed to join the Water District as an indispensable party under Federal Rule of Civil Procedure 19(b).
Like a boat navigating the most direct path from the Atlantic to the Gulf of Mexico, we decide this appeal in the most straightforward way available: Rule 19(b). In doing so, we decline any invitation by the parties to take a longer, unnecessary route to our decision. Because Rule 19(b) requires the dismissal of this case regardless of whether we agree with the Water District’s sequencing argument on cross-appeal or the Corps’s sovereign-immunity argument, we need not reach those matters. So just as a boat captain in the Waterway has little reason to prepare for *1309 rough waters at sea, we put these issues aside and affirm the district court’s judgment on the grounds that the Water District was an indispensable party under Rule 19(b).[1]
I. Background
To the Conservationists, this case is about the quality of water and the ecological conditions along the Waterway. To the Corps, it is about federal regulation of navigation through the Waterway. And to the Florida Department of Environmental Protection (“DEP”) and the Water District, the case is about protecting any authority the state might have over the waters at the center of this controversy. So resolving this case requires us to consider complex and overlapping interests. Because understanding these interests is critical to finding the right answer here, we review relevant background information below about Florida’s water geography, Florida’s water-ecology issues, the roles that the federal and state entities play in regulating the waters at issue in this case, and federal and state law concerning water quality.
A. Florida’s Water Geography
The Waterway is the only navigable cross-Florida water channel. Heading west from the Atlantic Ocean, the Waterway strings together the St. Lucie Inlet, the Indian River Lagoon, the St. Lucie River, the St. Lucie Canal, Lake Okeechobee, and the Caloosahatchee River to arrive at the Gulf of Mexico.
[[Image here]]
Okeechobee Waterway
This case primarily concerns the western part of the Waterway along the Caloo-sahatchee River, from Lake Okeechobee— “considered the heart of the water resources system in south Florida,” U.S. Army Corps of Eng’rs, Jacksonville Dist., Final Supplemental Envtl. Impact Statement, Lake Okeechobee Regulation Schedule i (2007) (“2007 LORS”) — heading west through the Caloosahatchee to the Gulf of Mexico.[2]
*1310 Besides their navigational function, the waters composing the Waterway also play many other important roles. They serve as the source of water to thousands of Floridians and are critical both to flood control and to the health of major ecosystems in Florida. The waters also host commercial fishing operations and visitors who enjoy using them for boating, canoeing, swimming, fishing, and wildlife observation.
Five navigation locks control the flow of water along the entirety of the Waterway. The Conservationists’ complaint relates to the management of three of these locks. First, the Moore Haven Lock and Spillway, known as “S-77,” is closest to Lake Okeechobee and controls flows between Lake Okeechobee and the Caloosahatchee River. Second, 15.5 miles to the west of S-77, on the Caloosahatchee River, lies the Ortona Lock and Spillway, known as “S-78.” Third, the W.P. Franklin Lock and Dam, known as “S-79,” is located 27.9 miles to the west of S-78 and is the westernmost lock on the Caloosahatchee River.[3] Opening a lock can allow water flow from one section of the Waterway to another, while maintaining a lock in a closed position can prevent water flow between parts of the Waterway.
B. Florida’s Ecological Water Issues
Florida suffers from a Goldilocks problem when it comes to water in the Waterway: too much or too little results in serious consequences. The waters in the Waterway are healthiest and most useful when they fall within a range that is just right. In this lawsuit, the Conservationists complain about only the problems that arise as a result of low water in the Caloosahatchee River, a condition they attribute in part to the Corps’s management of S-77, S-78, and S-79 under its 2008 regulation schedule. See generally U.S. Army Corps of Eng’rs, Jacksonville Dist., Cent. & S. Fla. Project: Water Control Plan for Lake Okeechobee & Everglades Agric. Area (2008) (“2008 LORS”).
Low water levels can have adverse effects on navigation, water supply, and fish and wildlife in the area. Among other negative effects, low water levels can aggravate ecological conditions in the Caloo-sahatchee and St. Lucie Estuaries by causing too high a level of salinity and saltwater encroachment into the freshwa-ters of the Waterway. But the Conservationists draw special attention to another serious problem associated with lower water levels: the emergence of algal blooms. Often characterized by the bright-green appearance of the water in which they are occurring, algal blooms represent a serious environmental problem because they consume an excessive amount of oxygen from the water when the constituent cells die. The remaining levels of oxygen may be too low to sustain aquatic life, which can die off as a result.
Algal blooms also can result in taste and odor problems with drinking water, contribute to the formation of carcinogenic substances in drinking water when it undergoes chlorination, and produce toxins that are not removed by the treatment process. Algal-bloom toxins, in turn, can cause liver and neurological disease in animals and humans who drink or come into contact with the water. They can induce skin irritations, kill fish and other animals, and seriously impair the recreational value *1311 of the body of water. And eating fish taken from waters during algal blooms is dangerous. Algal blooms have happened in the Caloosahatchee River eight of the eleven years between 2001 and 2012. In 2011, eight weeks of algal blooms proliferated.
C. The Federal and State Entities Who Regulate Florida’s Water Policy
Management of the Waterway and its constituent waters is essential to protect the health of the waters and to balance the important and sometimes-competing interests in the Waterway. As we have alluded to, both Florida and the Corps take part in that management.

1. The History of Florida’s Water Management

The State of Florida and the Corps have sought to manage the waters of Lake Okeechobee since the late 1800s, building a complex system of canals, levees, and storage areas to control the lake’s water levels. See Mildenberger v. United States, 643 F.3d 938, 941 (Fed. Cir. 2011) (reviewing the history of the Central & South Florida Project). Following hurricanes in 1926 and 1928 that resulted in flooding, damage, and many deaths, Congress enacted the Rivers and Harbors Act of 1930, authorizing the Chief of Engineers of the United States Army, under the supervision of the Secretary of War (now Secretary of the Army), to provide for flood control and navigation in Florida as well as elsewhere. Rivers and Harbors Act of 1930, Pub. L. No. 71-520, 46 Stat. 918 (1930).
In accordance with this Act, Congress directed the creation of a project for navigation and flood control in the Caloosahat-chee-Lake Okeechobee areas. See S. Doc. No. 115, 71st Cong., 2d Sess., at A-6 (1930) (Letter dated Mar. 15, 1930 from Lytle Brown, Major General, Chief of Engineers, United States Army, to Hiram W. Johnson, Chairman Committee on Commerce, U.S. Senate). More specifically, Congress acted on the Chief of Engineers’s recommendation to deem “the St. Lucie Canal, the Caloosahatchee Canal, and other channels forming the proposed cross-State waterway ... navigable waters of the United States and subject to the Federal laws for the protection of such waterways.” Id. at A-7.
In 1948, Congress authorized the Army Corps of Engineers to preside over the Central & South Florida Project (the “Project”) “for the benefit of navigation and the control of destructive floodwaters and other purposes.” Flood Control Act of 1948, Pub. L. No. 80-858, 62 Stat. 1175 (1948). The Project spans 12,000 square miles and includes the Okeechobee Waterway.
Although the Corps bears management and operational responsibility for the Project, the Water District — the Project’s “local sponsor” — maintains and operates many of the structures within the Project. But the Water District does not maintain and operate the “levees, channels, locks, and control works of the St. Lucie Canal, Lake Okeechobee, Caloosahatchee River, and the main spillways of the water conservation areas.” U.S. Army Corps of Eng’rs, Jacksonville Dist., Master Water Control Manual, Cent. & S. Fla. Project for Flood Control & Other Purposes: Auths. & Responsibilities 4-1 (1991). Those remain under the control of the Corps.
Rather, as the Water District has described its role in the Project, “the agency interacts with the [Corps] on Lake Okeechobee operations within the confines of the federally adopted lake regulation schedule.” South Florida Water Management District, Final Adaptive Protocols for Lake Okeechobee Operations iii (2010). The Water District further acknowledges that federal law requires local sponsors to “maintain and operate all works after completion in accordance with regulations pre *1312 scribed by the Secretary of War [Army].” Id. at 7 (alteration in original) (quoting 33 U.S.C. § 701c).
Federal law demands that excepted areas and water-coptrol structures — which include the S-77, S-78, and S-79 water-control structures — be operated and maintained in accordance with regulations approved by the Secretary of the Army. 33 C.F.R. § 208.10(a)(2). Congress intended the Corps’s control over these areas and structures to “serve[] a number of competing functions, including flood control, water supply, navigation, environmental protection and enhancement, and recreational purposes.” U.S. Army Corps of Eng’rs, Jacksonville Dist., Lake Okeechobee Regulation Schedule Study, Final Envtl. Impact Statement and Annex A i (1999).
To “conform with objectives and specific provisions of authorizing legislation and applicable Corps of Engineers reports,” the Corps manages Lake Okeechobee’s water levels in accordance with a regulation schedule. U.S. Army Corps of Eng’rs, Engineer Reg. 1110-2-240, Engineering and Design, Water Control Mgmt., Distribution Restriction Statement 2 (1982). The Corps develops water-control plans for each specific project and revises them as necessary, “provided such revisions comply with existing Federal regulations and established Corps of Engineers policy.” Id.

2. The 2008 LORS

The most recent water-control plan for the Project, the 2008 LORS, was a response to the heavy levels of rain Florida experienced in 2003-2005. See 2007 LORS at ii. The 2008 LORS represents an effort to more effectively address Lake Okeechobee’s high-water problems of the prior few years through a water-release “decision-making process that considers all the Con-gressionally-authorized project purposes.” 2008 LORS at 7-1.[4] Under the 2008 LORS, the “authorized project purposes” include “flood control; navigation; water supply for agricultural irrigation, municipalities and industry, the Everglades National Park ..., regional groundwater control, and salinity control.” Id.
Because the Corps must consider certain constraints on the water-control plan that are “interrelated and ... [may involve] physical, legal, political, social and major conflicts between authorized project purposes,” the 2008 LORS does not emphasize one project purpose over the others. Id. Instead, every water-release decision affecting Lake Okeechobee incorporates all project purposes.
Under the 2008 LORS, decision frameworks known as “management bands” guide the Corps’s water-control decisions relating to Lake Okeechobee. Id. at 7-10. Each management band provides water-release guidance corresponding with a particular level of water in Lake Okeechobee. The 2008 LORS establishes three broad management bands: the High Lake Management Band, the Operational Band, and the Water Shortage Management Band.
Unlike for the other bands, the 2008 LORS explains that “[t]he goal of [the Water Shortage Management Band] is to manage existing water supplies contained within Lake Okeechobee in accordance with [Water District] rules and guidance.” Id. at 7-24. Towards this end, the 2008 LORS provides that water releases for certain statutorily approved beneficial uses of Lake Okeechobee — including, among others, estuarine management and salinity control and dilution of pollutants in project canals — “may be restricted at the discretion of the [Water District] as outlined in *1313 the Water Shortage Management Band.” Id.
As this provision affects navigation, the 2008 LORS explains that the Water District “typically requests that the Corps implement reduced hours of lockages .... During reduced hours of lockages, water is conserved and saltwater migration upstream of S-79 is potentially reduced.” Id. at 7-25. But the 2008 LORS cautions, “[i]t is important to note that the [Water District] request for weekly allocation volume water supply deliveries may not be sufficient to maintain navigation depths in the [Waterway].” Id. Based on this circumstance, the Conservationists contend that when the Water Shortage Management Band is in effect, as a practical matter, the Corps’s authority to maintain navigation cannot be a consideration in water-management decisions because navigation is often not possible.
D.’ Laws Governing Administration of the Relevant Bodies of Water

1. The Relevant Florida Statutes

a. The Air and Water Pollution Control Act
Florida enacted the Air and Water Pollution Control Act in part to improve and protect the quality of Florida waters. See Fla. Stat. § 408.021(2). In furtherance of this goal, Florida empowered the DEP to promulgate necessary rules and regulations to implement the Air and Water Pollution Control Act. Id. § 403.061. Among the rules that the DEP created, Florida Administrative Code Rule 62-302.200, et seq. (“Florida Water Regulations”), eom-prehensively provides for the prevention, abatement, and control of pollution in the state’s navigable waters.
The Florida Water Regulations set forth guidelines such as the following for bodies of water like the Caloosahatchee River: minimum permissible levels of dissolved oxygen, see Fla. Admin. Codé R. 62-302.530(58); limitations on the concentration of dissolved solids, Fla. Admin. Code R. 62-302.530(59); prohibitions on “[s]ub-stances in concentrations which injure, are chronically toxic to, or produce adverse physiological or behavioral response in humans, plants, or animals,” Fla. Admin. Code R. 62-302.530(108); and maximum average salinity concentrations, Fla. Admin. Code R. 40E-8.221. The Conservationists assert that the Corps’s water-management decisions when the Water Shortage Management Band is in effect create water conditions that violate the Florida Water Regulations.
b. The Florida Water Resources Act
Florida originally passed its Water Resources Act in 1972. See Fla. Stat. § 373.013. Under the statute, private citizens have a cause of action to enjoin the operation of any stormwater facility that violates Florida law. But the Florida Water Resources Act also provides that “[t]he governing board or the [DEP] shall be a necessary party to any such suit.” Fla. Stat. § 373.433.[5]

2. The Clean Water Act

Congress enacted the Clean Water Act, 33 U.S.C. § 1251, et seq., to “restore and *1314 maintain the chemical, physical, and biological integrity of the Nation’s waters.” 33 U.S.C. § 1251(a). Towards this end, among other functions, the Clean Water Act regulates pollution control at federal facilities. See id. § 1323. In relevant part, it requires each agency with jurisdiction over a property or facility to be “subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity.” Id. § 1323(a). The statute exempts federal agencies, however, from any state law or regulation “affecting or impairing the authority of the Secretary of the Army ... to maintain navigation.” Id. § 1371(a).
II. Procedural History
The Conservationists filed suit against the Corps under the Clean Water Act. They sought declaratory and injunctive relief in the form of a judgment declaring that the Corps’s operation of S-77, S-78, and S-79 faded to comply with the Florida Water Regulations and the Florida Water Resources Act, and an injunction prohibiting the Corps from operating the structures in a manner that violates Florida law. More specifically, the Conservationists asserted that the Corps’s decisions to hold S-77, S-78, and S-79 closed when water is low causes violations of Florida’s water-quality standards for dissolved solids and dissolved oxygen in the Caloosahatchee River, regulations of salinity and minimum water flows and levels, and regulations prohibiting concentrations of injurious and chronically toxic substances in the water. The Conservationists also complained that the Corps’s operation of S-77, S-78, and S-79 interferes with the river’s designated uses for drinking-water supply, for recreation, and for propagation of fish and wildlife.
In response, the Corps moved to dismiss the complaint on the basis of sovereign immunity, relying on § 1371(a)’s caveat that the Clean Water Act “shall not be construed” as imposing liability where the allegedly prohibited conduct “affect[s] or impair[s] the authority” of the federal government to “maintain navigation.” 33 U.S.C. § 1371(a). Independently of the Corps, the DEP and the Water District moved to dismiss the complaint, invoking Eleventh Amendment sovereign immunity.[6] In turn, the Conservationists voluntarily dismissed the Water District and the DEP.
Despite the Conservationists’ voluntary dismissal of the state parties, the Water District then filed a motion for limited intervention in an effort to dismiss the entire case against all parties, relying -on Federal Rule of Civil Procedure 19(b) and the Eleventh Amendment. The Water District’s argument had two parts. First, the Water District contended that, even without considering the requirement under Florida law that the “governing board or the department shall be a necessary party,” the Water District was still a “required” party under Federal Rule of Civil Procedure 19(a), meaning that it should be joined if possible based on its role in the Project.
Second, the Water District asserted that, if it was a “required” party here, then it was also an “indispensable” party under Federal Rule of Civil Procedure 19(b) as a result of its significant regulatory interests and responsibility over various aspects of the Project. In the Water District’s view, because it was both indispensable under *1315 Rule 19(b) and immune from suit on the basis of its Eleventh Amendment immunity, the lawsuit had to be dismissed against all parties without reaching the issue of whether sovereign immunity protected the Corps’s water-control decisions.
So, in a nutshell, the Conservationists asserted that the Corps is liable under the Clean Water Act for violating the Florida Water Regulations because the Florida Water Resources Act provides a cause of action against any stormwater facility that violates Florida law. And the Corps responded by claiming sovereign immunity under § 1371(a) of the Clean Water Act based on the role navigation plays in its management decisions. But since the Conservationists relied in part on the Florida Water Resources Act to allege a violation of the Clean Water Act, the Water District contended that the litigation' — including resolution of the Corps’s claim of sovereign immunity — could not proceed without it. And because the State invoked sovereign immunity, the Water District reasoned, the district court was required to dismiss the case without first considering the Corps’s claim of sovereign immunity.
The district court granted the Conservationists’ motion to dismiss without prejudice the Water District and the DEP [7]- and denied the Water District’s motion for limited intervention. As the court explained its ruling, the court declined to allow the Water District to intervene without waiving its Eleventh Amendment immunity. Nevertheless, the court did allow the Water District to participate in the case as amicus curiae to present the arguments it wished. The order specifically preserved and did not rule on whether the case could proceed without the Water District as a party.
On May 26, 2014, after further proceedings before both the district court and this Court relating to these motions and others,[8] the district court dismissed the Conservationists’ complaint under Federal Rule of Civil Procedure 12(b)(1) on the grounds that § 1371(a) of the Clean Water Act preserves the Corps’s sovereign immunity from suit when, as the district court *1316 concluded applied in this case, the Corps’s authority to maintain navigation is at issue. Finding that granting the Corps’s motion resolved the case in its entirety, the district court ruled that the Water District’s motion to intervene was moot.
In an alternative ruling, the district court determined that, under § 378.433 of the Florida Statutes, the case could not proceed without the Water District or the DEP. In light of this alternative ruling, the district court expressly found it “unnecessary to decide whether ... the [Water] District would be [an “indispensable” party] without whom the case could not go forward” under Rule 19(b). In effect, the district court declined to grant the Water District’s request to consider first (before evaluating the Corps’s sovereign-immunity argument) the Water District’s procedural argument under Federal Rule of Civil Procedure 19(b). And, in fact, the district court chose not to rule at all on the Water District’s Rule 19(b) argument.
The Conservationists appealed the district court’s order dismissing the case based on the Corps’s sovereign immunity. Meanwhile, the Water District cross-appealed, challenging the district court’s decision not to address, as a threshold matter, the Water District’s argument that the litigation must be dismissed under Rule 19(b).
III. Discussion
We may affirm the district court’s ruling on any basis the record supports. Haynes v. McCalla Raymer, LLC, 793 F.3d 1246, 1249 (11th Cir. 2015). We may do so “regardless of the grounds addressed, adopted or rejected by the district court.” Bonanni Ship Supply, Inc. v. United States, 959 F.2d 1558, 1561 (11th Cir. 1992). After careful review, we affirm the judgment of the district court on the basis that the Water District was an indispensable party under Rule 19(b).
Rule 19, Fed. R. Civ. P., governs the required joinder of parties to an action. Rule 19(a) lays out the standards for determining whether a party is “required” by virtue of its interest in or importance to the action, and Rule 19(b) provides factors for a court to consider in determining whether, “in equity and good conscience,” the action may proceed when a required party cannot be joined:
Rule 19 states a two-part test for determining whether a party is indispensable. First, the court must ascertain under the standards of Rule 19(a) whether the person in question is one who should be joined if feasible. If the person should be joined but cannot be (because, for example, joinder would divest the court of jurisdiction) then the court must inquire whether, applying the factors enumerated in Rule 19(b), the litigation may continue.
Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1279-80 (11th Cir. 2003) (internal quotation marks omitted); see Fed. R. Civ. P. 19.
Here, the Water District contends that it cannot be joined because it invokes its sovereign immunity. So the questions we must answer under Rule 19 include the following: (1) is the Water District a required party under Rule 19(a)? And (2) if so, under Rule 19(b), “in equity and good conscience,” should the litigation proceed in the Water District’s absence?
We begin with Rule 19(a), which provides that a party is required if “that [party] claims an interest relating to the subject of the action and is so situated that disposing of the action in the [party’s] absence may ... as a practical matter impair or impede the [party’s] ability to protect the interest.” Fed. R. Civ. P. 19(a). We have held that “pragmatic concerns, especially the effect on the parties and the litigation, control” this analysis. Focus on *1317 the Family, 344 F.3d at 1280 (internal quotation marks omitted).
In its motion to dismiss, the Water District claimed a strong interest in the outcome of the litigation in this case, and it argued that that interest would be inadequately protected in-the Water District’s absence. We agree. As we reviewed above, the Water District is involved in an integral way in the Corps’s management of the Project. The Water District is the local sponsor for the Project. So it maintains and operates many of the Project’s structures.
Indeed, under the 2008 LORS, when the Water Shortage Management Band is in effect, the Corps defers to the Water District’s discretion to restrict water releases. So any injunction against the Corps as it relates to water-release decisions in the Water Shortage Management Band could, as a practical matter, potentially affect the Water District’s discretion.
Plus, the Corps and the Water District must cooperate closely whenever tension may arise between the Corps’s navigation goals and the Water District’s conservation, water-quality, and other goals under the Water Shortage Management Band. So any adjudication of the Corps’s liability or the scope of its authority has the potential to carve a jagged line through the cooperative arrangements that the Corps and the Water District use to implement the Project.
And the Conservationists are not in any position to safeguard the Water District’s interests in the litigation. Although the Conservationists and the Water District share a general goal of protecting water quality, their interests are not the same. Nor can the Conservationists speak to how judicial intervention would affect the Water District’s working relationship with the Corps or the Water District’s ability to discharge all its duties — not just those relating to the litigation — under the Project and Florida law. For all these reasons, we conclude that the Water District is a required party under Rule 19(a).
We turn now to the second question — whether the action should be dismissed “in equity and good conscience” for lack of the Water District’s involvement. See Fed. R. Civ. P. 19(b). That is, we ask whether the Water District is a party traditionally labeled “indispensable” under the common law. See Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 119, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968) (“[A] court does not know whether a particular person is ‘indispensable’ until it ha[s] examined the situation to determine whether it can proceed without him.”); see generally 7 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, A. Benjamin Spencer & Adam N. Steinman, Federal Practice & Procedure: Federal Rules of Civil Procedure § 1601 (3d ed. 2016) (reviewing the incorporation of the doctrine into federal law).
Rule 19(b) sets out four factors for us to consider:
(1) the extent to which a judgment rendered in [the Water District’s] absence might prejudice [the Water District] or the other parties; (2) ‘the extent to which any prejudice could be lessened or avoided by’ ‘protective provisions in the judgment,’ ‘shaping the relief,’ or ‘other measures’; (3) whether a judgment rendered in [the Water District’s] absence would be adequate; and (4) whether [the Conservationists] would have an adequate remedy if we dismissed the entire case.
Thermoset Corp. v. Bldg. Materials Corp. of Am., 849 F.3d 1313, 1319 (11th Cir. 2017) (quoting Fed. R. Civ. P. 19(b)). Accounting for these factors, we explain below why the Water District qualifies as an indispensable party.
*1318 First, the Water District’s interests would be greatly prejudiced by an action proceeding in its absence. Beyond those practical concerns we have already discussed that might arise from judicial intervention into the Water District’s relationship with the Corps, we must give strong consideration to the Water District’s interest in this case because the Water District is a sovereign entity to which we owe comity.
In Rule 19(b) cases where a required party asserts sovereign immunity, the Supreme Court has instructed us to give “[ jsufficient weight to [the party’s] sovereign status” out of recognition that any consideration of the merits in the sovereign’s absence is “itself an infringement on ... sovereign immunity.” Republic of Philippines v. Pimentel, 553 U.S. 851, 864-65, 128 S.Ct. 2180, 171 L.Ed.2d 131 (2008).[9] Taking our cue from the way in which the Supreme Court has applied this concept, we have no choice but to conclude that the Water District is, in fact, “indispensable” to this litigation.
Pimentel involved an interpleader action to divide assets of Ferdinand Marco, the former president of the Republic of the Philippines, payable as damages to certain victims of his human-rights abuses, but to which other parties — including state parties — had made claims. See id. at 857-59, 128 S.Ct. 2180. The Court detailed some of the considerations militating against allowing the interpleader action to proceed in U.S. federal court without the Philippines state parties as defendants: the damages owed to the human-rights victims had been awarded on the basis of “events of historical and political significance” to the Philippines and its people; the Philippines had an assumed comity interest in using its own courts to decide the dispute; and it would be an affront for one state to seize another’s property even if by judicial means. See id. at 866, 128 S.Ct. 2180.
Here, adjudication of the Conservationists’ complaint without the Water District’s involvement would be an affront to Florida’s sovereignty for similar reasons, even though the Water District and the Corps possess overlapping jurisdiction over Florida’s water resources. Because of the way the Conservationists have framed the Corps’s alleged transgressions — as violations of the Clean Water Act only because they violate Florida Water Regulations and Florida’s Water Resources Act — this case is fundamentally about Florida’s protection of its own natural resources.
And notably, the relevant Clean Water Act provision expressly incorporates all state pollution-control rules, no matter *1319 whether procedural or substantive. See 33 U.S.C. § 1323(a). In this case, although we need not discern the precise meaning of the phrase “necessary party” in the Water Resources Act, Fla. Stat. § 373.433,[10] the plain import of the language — which is incorporated into the federal cause of action under § 1323(a) — is to ensure adequate representation and protection of Florida’s interests in any action under the Florida Act. Proceeding without the Water District, then, would not only prejudice the State’s interests in the ways we have identified but also run counter to the State’s express intention under the Water Resources Act to be involved in any action relying on its own statute. In sum, this first factor under Rule 19(b) weighs heavily in favor of dismissal.
Second, because of the nature of the Water District’s interests in the case, we can discern no way in which prejudice could be avoided by means other than joinder. As we have discussed, any relief in this case would take the form of an injunction with potentially substantial consequences for the Water District’s management of the Waterway. Regardless of whether the Water District might find a court order simple to follow, no protective measures could mitigate the Water District’s lack of discretion in pursuing its own management strategy. This second factor also weighs in favor of dismissal.
Third, the adequacy of the judgment would suffer without the Water District’s involvement. True, the Water District could not be held liable in a formal sense were it a party, so it is not meaningful to ask whether ' the Water District would be bound by a judgment in favor of the Conservationists. But adequacy refers to more than just the enforceability of a judgment against particular parties; it refers to “the public stake in settling disputes by wholes, whenever possible.” See Pimentel, 553 U.S. at 870, 128 S.Ct. 2180 (internal quotation marks omitted). And deciding this case without the Water District would not result in that outcome. To the extent that the Corps takes the position that the Water District enjoys discretion to restrict water flows in the Water Shortage Management Band only because the Corps has chosen to defer to the Water District in that circumstance, any injunction against the Corps would not end the litigation but instead could set up a battle between the Corps and the Water District over who has the ultimate authority for making water-release decisions. If it’s the Corps, an injunction against the Corps would eliminate the Corps’s ability to choose to defer to the Water District, which, in turn, would end the Water District’s discretion to restrict releases. But if it’s the Water District, an injunction against the Corps would have no effect on the Water District’s authority to exercise its water-release discretion.
This public interest surpasses the private interests of potential parties because it also includes “considerations of efficiency” that counsel in favor of limiting the expenditure of public resources to one proceeding, rather than multiple ones, to resolve the same controversy. See Provident Tradesmens Bank, 390 U.S. at 111, 88 S.Ct. 733. Here, the Conservationists ultimately seek to effect change in the way decisions are made about water control in the Waterway. Leaving out a major player that bears responsibility for making and implementing such decisions would deprive the process of its adequacy towards that *1320 end. So this factor also weighs in favor of dismissal.
Fourth, even if dismissal of this action will preclude an alternative remedy for the Conservationists,[11] this factor’s weight in favor of proceeding with litigation cannot, in the circumstances of this case, overcome the weight of the other three to the contrary, in light of Pimentel. The Supreme Court has already told us as much in materially indistinguishable circumstances: “Any prejudice to [the Conservationists] in this regard is outweighed by prejudice to the absent entities invoking sovereign immunity. Dismissal under Rule 19(b) will mean, in some instances, that plaintiffs will be left without a forum for definitive resolution of their claims.” Pimentel, 553 U.S. at 872, 128 S.Ct. 2180. Indeed, the Pimentel Court’s sovereign-immunity analysis leaves little room for any other conclusion here:
A case may not proceed when a required-entity sovereign is not amenable to suit. ... [Wjhere sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign.
Pimentel, 553 U.S. at 867, 128 S.Ct. 2180.
That describes the case in this proceeding. The Water District is entitled to and has invoked sovereign immunity, and we cannot ignore that it could suffer significant cognizable injury to its interests if the litigation here proceeds without it. We can appreciate the district court’s equitable concern that “[t]he [Water] District cannot eat its cake and have it, too.... The [Water] District can come aboard or not as it chooses, but it cannot have it both ways.” But we think Pimentel requires us, at least in this situation, to reach the opposite conclusion. Because the Water District is an indispensable but absent sovereign, the action must be dismissed under Rule 19(b).
We conclude our discussion by expressly declining to rule on the Water District’s argument about improper sequencing of the district court’s rulings. The Rule 19(b) analysis fully disposes of the case, regardless. Even if the district court erred in ruling on the Corps’s sovereign-immunity argument first,[12] we are nonetheless under no obligation to address the issue on appeal. The principle that we may decline to decide any issues unnecessary to resolving an appeal is a firm one, “even if the district court did not apply the proper standard” in addressing an issue we choose not to consider. Am. Dental Ass’n v. Cigna Corp., 605 F.3d 1283, 1293 n.3 (11th Cir. 2010).
IV. Conclusion
For these reasons, we affirm the district court’s dismissal of the Conservationists’ action.
AFFIRMED.

. All pending motions are denied as moot.

. Lake Okeechobee takes its name from the Muskogee words for "water” ("ofeee”) and "big” (“chobee”). State Library & Archives of Florida, Okeechobee, http://www. floridamemory.com/blog/2013/10/07/ okeechobee/ (last visited June 15, 2017). It is the third-largest natural freshwater lake (by surface area) contained entirely within the United States. Encyclopaedia Britannica, Lake Okeechobee, https://www.britannica.com/ place/Lake-Okeechobee (last visited June 15, 2017).

. The last several miles of the Caloosahatchee River, located within the stretch between the Gulf of Mexico and S-79, house the Caloosa-hatchee Estuary. An estuary is a body of water that is partially enclosed, along with its surrounding coastal habitats, where fresh water from rivers or streams combines with salt water from the ocean. See National Estuarine Research Reserve System, Where Rivers Meet the Sea, https://coast.noaa.gov/data/estuaries/ pdi/where-rivers-meet-the-sea-teacher-guide. pdf (last visited June 15, 2017).

. The page numbering of the 2008 LORS contains two numbers: the first represents the larger section, and the second is the page number within the larger section.

. The statute reads,
Any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works which violates the laws of this state or which violates the standards of the governing board or the [DEP] shall be declared a public nuisance. The operation of such stormwater management system, dam, impoundment, reservoir, appurtenant work, or works may be enjoined by suit by the state or any of its agencies or by a private citizen. The governing board or the [DEP] shall be a necessary party to any such suit.
Fla. Stat. § 373.433. The Florida Statutes do not define the meaning of the term "necessary party.”

. Although the Conservationists articulated no claim and sought no relief against any state actors, they included the DEP and the Water District as "necessary partfies]” to the action under the Florida Water Resources Act.

. Although the district court acknowledged the Conservationists had already sought to voluntarily dismiss the state parties by filing a notice of dismissal, the court made the dismissal official without deciding whether a notice of voluntary dismissal could suffice to dismiss a party in the absence of an amended complaint.

. Below is a brief explanation of the proceedings that occurred between the district court's dismissal of the Water District as a party on December 21, 2012, and the district court’s operative Order dismissing the case on May 26, 2014:
On January 4, 2013, the Water District moved for reconsideration of the December 21, 2012, order denying the Water District’s motion to intervene. Although the district court heard oral argument on the Water District’s motion for reconsideration, before the district court could issue a ruling, the Water District filed a notice of appeal of the district court's December 21, 2012, order.
While the Water District’s appeal from the December 21 order was pending before this Court, the district court entered an order on September 27, 2013, indicating its intent to dismiss the case as a whole upon resolution of, or remand from, the pending appeal. The September 2013 order stayed district-court proceedings pending resolution of the appeal of the December 21 order or remand for entry of a dismissal order, and it directed the parties to notify the clerk of this Court concerning the entry of the court’s indicative rulings.
On October 25, 2013, the Water District filed in this Court a motion to retain jurisdiction and opposition to remand, contesting- the indicative rulings that the district court entered. We dismissed the Water District’s appeal for lack of jurisdiction, and we denied all pending motions as moot. On remand, the district court filed its May 26, 2014, order dismissing the case. It is that order from which the Conservationists and the State each appeal.

. The sovereign in question in Pimentel was foreign, and the Court noted that foreign sovereign immunity in particular "is premised upon the perfect equality and absolute independence of sovereigns,” Pimentel, 553 U.S. at 865, 128 S.Ct. 2180 (internal quotation marks omitted), but the Court’s reasoning regarding the application of Rule 19(b) appears just as applicable to the context of domestic federal-state relationships insofar as immunity from private suit is concerned. Compare id. at 866, 128 S.Ct. 2180 ("[F]oreign sovereign immunity derives from standards of public morality, fair dealing, reciprocal self-interest, and respect for the power and dignity of the foreign sovereign.”) (internal quotation marks omitted), with Alden v. Maine, 527 U.S. 706, 714, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (“The federal system established by our Constitution preserves the sovereign status of the States .... [I]t reserves to them a substantial portion of the Nation's primary sovereignty, together with the dignity and essential attributes inhering in that status.”). If anything, state sovereign immunity presents a more compelling case under Rule 19(b), as it "is a constitutional doctrine that is meant to be both immutable by Congress and resistant to trends,” which is not the case with foreign sovereign immunity. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 686 n.4, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (emphasis in original).

. Case law regarding the proper application of Rule 19(b) is dispositive in this case regardless of the meaning of this phrase in the Florida statute. We would be the first court, state or federal, to define the scope of the phrase, and we see no need to attempt to do so here.

. It is not clear that the Conservationists have no other remedy available. For example, it would appear that the Conservationists could seek a remedy under the Administrative Procedure Act, 5 U.S.C. § 501, et seq. ("APA”), given the nature of their challenge to the LORS regulations and the United States’s broad waiver of immunity under the APA. See, e.g., Golden Pac. Bancorp v. Clarke, 837 F.2d 509, 512 (D.C. Cir. 1988).

. To be clear, we express no view on this issue.