[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12064

_____

WILLIAM A. LEMONS, JR. MD,

Plaintiff-Appellant,

*versus*

PRINCIPAL LIFE INSURANCE COMPANY,

Defendant-Appellee,

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:18-cv-01040-CLM

_____

Before GRANT, ABUDU, and ED CARNES, Circuit Judges.

PER CURIAM:

Appellant William A. Lemons, Jr., M.D., a doctor who specialized in obstetrics and gynecology ("OB/GYN"), sued Principal Life Insurance Company ("Principal") for breach of contract and bad faith for its refusal to pay him disability benefits under a "regular occupation rider" provision contained in his insurance policy with the company. A jury returned a verdict in Lemons's favor on the breach of contract claim and in favor of Principal on the bad-faith claim. On appeal, Lemons challenges the district court's rulings limiting the extent of damages he could recover, dismissing one of his purported claims as time-barred, and denying his motion for judgment as a matter of law or, in the alternative, for a new trial as to his bad-faith claim. He also argues that the district court improperly allowed Principal to present a new theory of defense for the first time at trial. After carefully reviewing the record and the parties' briefs, and with the benefit of oral argument, we affirm the district court's judgment.

## I.    FACTUAL BACKGROUND
### A. Relevant Policy Provisions

In November 1995, after completing his OB/GYN residency, Lemons purchased a long-term disability insurance policy from Principal. The policy included two provisions that are relevant to this appeal: (1) a "regular occupation rider"; and (2) a "benefit update rider."

The "regular occupation rider" provided disability benefits to an insured if the following three criteria were satisfied:

> (1) Solely due to an injury or [s]ickness you are unable to perform the substantial and material duties of your regular occupation in which you were engaged just prior to the [d]isability;

> (2) You are receiving care from a [d]octor which is appropriate for the condition causing your [d]isability . . . ; and

> (3) You are engaged in another occupation.

The "benefit update rider" required Principal to review an insured's disability benefits every three years from the policy's issuance date and to seek "current underwriting information prior to the [p]olicy [a]nniversary." Based on the current underwriting information received, Principal could increase a policyholder's disability benefit and "adjust to the maximum allowable [d]isability [b]enefit . . . based on the information received and [Principal's] then current underwriting guidelines." The policy noted, however, that the maximum monthly benefit was capped at $10,000.

Lemons received letters from Principal regarding the "benefit update" rider provision in 2004, 2007, and 2010. The 2004 letter stated that Lemons had been approved for an increase under the rider provision to a monthly benefit amount of $10,000. The 2007 and 2010 letters both denied Lemons's request for an increase pursuant to the rider provision, explaining that after reviewing the

financial information he sent, Principal had determined he was "fully insured for the maximum benefit amount."

### B. Lemons's Work History and Disability Benefits Claims

From 2008 to 2015, Lemons worked as a staff physician with Trinity OB/GYN at Trinity Medical Center. In August of 2015, Trinity terminated Lemons's employment. Soon after his departure from Trinity, Lemons decided to open his own OB/GYN practice, which he called Covenant Gynecology & Wellness, P.C. ("Covenant"). In October 2015, during Covenant's business development phase, Lemons worked for Blue Cross Blue Shield ("BCBS") as an insurance claims consultant. A few months later, in February 2016, he began working at the Birmingham Metro Treatment Center, an opioid addiction treatment and recovery facility. A month later, he started working at the Fritz Clinic, another opioid treatment clinic.

In April 2016, Lemons opened Covenant and started seeing patients. At first, he only met with patients three days a week. He did not deliver babies or otherwise engage in obstetrics, and he did not submit any insurance claims for any obstetrics-related work. Eventually, Lemons devoted most of his time and resources to Covenant, and he reduced the number of hours at his other jobs to concentrate more on his OB/GYN practice. Unfortunately for Lemons, his solo medical practice was unsuccessful, and on July 15, 2016, he closed Covenant because he was not seeing enough patients.

Lemons's deteriorating health also played a significant role in his decision to close Covenant. Beginning in 2013, Lemons started developing hand tremors and was officially diagnosed with a neurological condition in March 2016. Consequently, while Covenant was open, he had to refer some of the few patients he did have to other doctors.

After Lemons closed Covenant, Principal received a letter from Lemons's neurologist regarding his medical condition and opened a claim for benefits under the policy. On October 19, 2016, Principal sent Lemons a form that had a section titled "Proof of Loss Needed," that directed Lemons to, among other things, complete a Health Insurance Portability and Accountability Act authorization form, cooperate in interviews, and submit financial information. Principal assigned senior claims consultant Amy Ralston to Lemons's claim.

In November 2016, Lemons completed a disability claim form and reported that, as of July 15, 2016, he was totally disabled and could no longer work as an OB/GYN. Ralston subsequently conducted a phone interview with Lemons. During the interview, Lemons stated that he was working at BCBS approximately 15 hours per week, at Birmingham Metro approximately 12–18 hours per week, and at the Fritz Clinic 4 hours per week. He maintained that, at the time of his disability, his regular occupation was as an OB/GYN and, therefore, Principal should approve his claim under the "regular occupation rider." Ralston responded that because Lemons was working other non-OB/GYN jobs when he became

disabled, Principal could not just look at his occupation as an OB/GYN and would need to consider his other jobs in evaluating his claim.

On January 23, 2017, Principal approved Lemons's claim under a "loss of earnings" provision in the policy based on the reduction to Lemons's income as a result of his disability. A few weeks later, on February 9, 2017, Principal denied Lemons's claim for benefits under the "regular occupation rider" provision. Principal explained that, because Lemons regularly worked at BCBS, Birmingham Metro, and the Fritz Clinic prior to the onset of his disability, he was not "totally disabled from all occupations that [he was] engaged in prior to [d]isability" as the regular occupation rider required.

On two separate occasions, in June 2017 and February 2018, Lemons asked Principal to reconsider its position, and he challenged Principal's finding that July 15, 2016, was the trigger date for his disability coverage. Principal's stance was that because Lemons had not provided any additional information to warrant a change in its position, it would not alter its decision regarding his claim.

## II.    PROCEDURAL HISTORY

Lemons originally sued Principal in state court on June 4, 2018, and Principal removed the case to federal court. In his second amended complaint, he included only two counts—one for breach of contract based on Principal's failure to pay him disability benefits under the regular occupation rider provision; and the other alleging bad faith on Principal's part. His bad faith insurance claim

operated under two different legal theories: a failure-to-pay the full amount he was owed in disability benefits, and a failure-to-investigate his benefits claim properly. The second amended complaint contained allegations regarding Principal's denial of benefits, but it did not include any specific counts or factual allegations regarding the "benefit update rider" provision, or anything related to the cap on disability benefits.

Following discovery, in his cross-motion for summary judgment, Lemons maintained that his benefits should have been based on his regular occupation as an OB/GYN and the denial of benefits under this provision was in bad faith. In addition, Lemons argued that the $10,000 cap on his insurance benefits was a breach of contract because Principal marketed and sold him the policy as including a "capless" benefit rider.

Principal, on the other hand, argued in its cross-motion that (1) the term "regular occupation," as defined in the policy, meant all material work duties Lemons was performing prior to his disability onset date; (2) there was no bad faith because Principal had a legitimate, arguable, or debatable reason for denying the regular occupation rider benefits; and (3) Lemons never alleged a benefit rider claim in his second amended complaint and, regardless, any such claim was time-barred.

In separate orders, the district court denied the cross-motions for summary judgment. It also dismissed Lemons's "benefit update rider" claim because he had not pled it in his complaint, and even if he had, it was time-barred and equitable tolling did not

apply. The court did grant, however, Lemons's motion in limine to prohibit Principal from arguing any other basis for the denial of his "regular occupation rider" benefits which Principal did not consider when making its decision. The case proceeded to trial.

Towards the end of the trial, Lemons moved for judgment as a matter of law on his breach of contract and bad-faith claims. The district court denied the motion. The court also ruled that Lemons could not seek compensatory damages for emotional distress and mental anguish on the breach of contract claim if successful. The jury ultimately awarded Lemons $492,409 in damages on the breach of contract claim. Lemons renewed his motion for judgment as a matter of law as to the jury's verdict on the bad-faith claim and moved, in the alternative, for a new trial. The district court denied Lemons's motions, and he filed the instant appeal.

## III.    ANALYSIS

Lemons argues the district court erred by: (1) not allowing him to seek mental anguish damages for the breach of contract claim; (2) dismissing his "benefit update rider" claim; (3) denying his motion for judgment as a matter of law or a new trial with respect to his bad faith claim; and (4) allowing Principal to present a "proof of loss" defense. We address Lemons's four arguments in turn.

### A. Mental Anguish Damages

Lemons contends that the district court erred in concluding that Alabama law prohibits the collection of damages for emotional or mental anguish in breach of contract cases involving

disability claims.  In the alternative, Lemons asks us to certify the issue to the Alabama Supreme Court.

Our prior precedent forecloses Lemons's argument.  *See Walker v. Life Ins. Co. of N. Amer.*, 59 F.4th 1176, 1189 (11th Cir. 2023) ("The Supreme Court of Alabama has made clear that mental anguish damages are unavailable for breach of contract claims related to long-term disability insurance policies . . . and no further clarification on this point of state law is needed.").  Moreover, "certification [on this issue] is neither necessary nor appropriate, as Alabama law already answers the question presented." *Id*. at 1191.  Therefore, we affirm the district court's ruling as to Lemons's recoverable damages.

### B.  The "Benefit Update Rider" Claim

We also reject Lemons's argument that the district court erred in not allowing him to amend his complaint to include a breach of contract claim based on the policy's "benefit update rider" provision.

We generally review the denial of a motion to amend for an abuse of discretion, but a denial based on futility is reviewed *de novo*. *City of Miami v. Citigroup Inc.*, 801 F.3d 1268, 1275 (11th Cir. 2015).  Although "[a] court should freely give leave when justice so requires," FED. R. CIV. P. 15(a)(2), a district court may deny a request for leave to amend a complaint as futile "when the complaint as amended would still be properly dismissed," *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007).

Lemons acknowledges that he did not specifically plead a separate claim related to the "benefit update rider" provision. Instead, he argues that he only became aware of the rider during discovery, and that the first judge assigned to the case understood him to be raising such a claim. Because we agree with the district court's alternative conclusion that any "benefit update rider" claim that Lemons might have brought would have been time-barred and not subject to equitable tolling, we will not reach the issue of whether the district court erred in determining that he failed to adequately plead such a claim. *See Fla. Wildlife Fed'n Inc. v. U.S. Army Corps of Eng'rs*, 859 F.3d 1306, 1320 (11th Cir. 2017) ("The principle that we may decline to decide any issues unnecessary to resolving an appeal is a firm one.").

It is undisputed that Principal sent letters to Lemons regarding the "benefit update rider" provision in 2004, 2007, and 2010. The 2004 letter explained that his benefits had increased to $10,000 per month, and the subsequent letters informed him that his benefits had been capped at that amount. Thus, although Lemons argues he was unaware of the cap before his lawsuit, Principal put him on notice of the cap in 2007 and, at the very latest, in 2010. Lemons, however, did not file suit until June of 2018. Because Alabama has a six-year statute of limitations on breach of contract claims, *see* Ala. Code § 6-2-34(9), Lemons's 2018 suit was outside of the statute of limitations and, therefore, time-barred.

Lemons also argues, unsuccessfully, that the doctrine of fraudulent concealment tolled the statute of limitations. Under

Alabama law, the statute of limitations on a breach of contract claim can be tolled "when the defendant has fraudulently concealed" a claim. *Dodd v. Consol. Forest Prods., LLC*, 192 So. 3d 409, 412 (Ala. Civ. App. 2015). Fraudulent concealment is an issue that "is removed from the purview of the jury and can be decided as a matter of law" if "one receives documents that would put one on such notice that the fraud reasonably should be discovered." *Ex parte Am. Gen. Fin., Inc.*, 795 So. 2d 685, 689–90 (Ala. 2000) (citations and internal quotation marks omitted). Here, as explained above, in 2007 and 2010, Lemons requested an update in benefits, but Principal denied those requests because he was already "fully insured for the maximum benefit amount." Therefore, the limitations period began to run when Lemons was in receipt of information that "would provoke inquiry in a reasonable person that, if followed up, would lead to the discovery of the fraud." *Dickinson v. Land Devs. Const. Co.*, 882 So. 2d 291, 298 (Ala. 2003). Lemons received such information in notices sent to him in 2007 and 2010 informing him that his benefits had been capped. The district court, therefore, did not err in concluding that the statute of limitations could not be tolled.

### C. The Bad-Faith Claim

Next, Lemons contests the district court's denial of his motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 or, in the alternative, his motion for a new trial under Federal Rule of Civil Procedure 59, on his bad-faith claim.

"A Rule 50 motion for judgment as a matter of law is reviewed *de novo*, and this Court applies the same standards employed by the district court." *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000). Judgment as a matter of law is appropriate if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving party.]" FED. R. CIV. P. 50(a). In deciding such a motion, we review all the evidence and draw all reasonable inferences in favor of the nonmoving party. *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 724 (11th Cir. 2012) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). However, we do not assess credibility or weigh evidence; rather, we look to the evidence supporting the nonmoving party's case and the unchallenged evidence supporting the moving party. *See id.* (citing *Reeves*, 530 U.S. at 151).

A Rule 59 motion for a new trial is reviewed for "a clear abuse of discretion." *See Wolff v. Allstate Life Ins. Co.*, 985 F.2d 1524, 1528 (11th Cir. 1993). The district court should grant such a motion "when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice[.]" *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (internal quotation marks omitted).

The district court did not err in denying both of Lemons's motions. For Lemons to prevail on the bad-faith claim, he needed to demonstrate: "(1) a breach of an insurance contract; (2) a refusal to pay the claim; (3) the absence of an arguable reason for failing to pay; and (4) the insurer's knowledge of such an absence."

*Walker*, 59 F.4th at 1186.  Because Lemons was asserting a bad-faith claim under a failure-to-investigate theory as well, he needed to show "the insurer's intentional failure to determine whether there [wa]s a legitimate or arguable reason to refuse to pay the claim." *Id*. at 1886–87 (internal quotation marks omitted).

At trial, Lemons testified that he spent most of his time working at Covenant prior to the onset of his disability.  He also testified that during this same time period, he was working for two opioid addiction treatment centers and for BCBS, and none of those positions involved his skills as an OB/GYN.  He further admitted that he did not derive any income from his practice at Covenant and did not submit any insurance claims for OB/GYN services to patients.  Given all the evidence, the jury could have found a "legally sufficient evidentiary basis" to determine that Lemons's primary occupation was something other than an OB/GYN when he became disabled.  *See Hubbard*, 688 F.3d at 724 (citing FED. R. CIV. P. 50(a)).  Moreover, the fact that the jury ruled in Lemons's favor on the breach of contract claim while finding no bad faith on Principal's part is irrelevant for purposes of determining whether the jury's verdict had a "legally sufficient evidentiary basis."  *Id*. ("Only the sufficiency of the evidence matters; what the jury actually found is irrelevant.").  The district court, therefore, did not err in denying Lemons's motion for judgment as a matter of law.  The jury also could have found that Principal had an arguable reason for not issuing Lemons benefits pursuant to the "regular occupation rider" policy provision because the evidence showed that Principal

gathered—as part of its decisional process—information suggesting that Lemons's regular occupation was not as an OB/GYN.

For these same reasons, the district court also did not clearly abuse its discretion in denying Lemons's motion for a new trial. The verdict in this case was not against the clear weight of evidence given the genuine issue of fact as to whether a breach of contract occurred.

### D. The "Proof of Loss" Defense

Lemons's final argument on appeal also is without merit. He contends that, contrary to the district court's ruling on his motion in limine, Principal nevertheless introduced a new theory of defense during trial, accusing Lemons of failing to present proof of loss to support his benefits claim. Not only does the record not support Lemons's position, but Principal also actually admitted to receiving proof of loss from Lemons, upon which it relied in determining which insurance benefits Lemons was due. Therefore, there is no basis for Lemons's "proof of loss" argument, and the district court committed no error in this regard.

### IV.    CONCLUSION

Based on the foregoing, we **AFFIRM** the district court's judgment.