[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10967

_____

MARYBETH LUKIE,

Plaintiff-Appellant,

*versus*

METLIFE GROUP, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-00943-TPB-AAS

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and ABUDU, Circuit Judges.

PER CURIAM:

Marybeth Lukie appeals the district court's grant of summary judgment in favor of her former employer, MetLife Group, Inc. ("MetLife"), in an action alleging sex discrimination and retaliation under the Florida Civil Rights Act ("FCRA"), FLA. STAT. § 760.10(1)(a), (7). Lukie, the only female vice president in her department at the time, contends that she was relegated to gender-based stereotypical tasks unlike any of her male colleagues, paid less than her male counterparts, and retaliated against by her supervisor for complaining about the treatment. The district court, in applying the *McDonnell Douglas* test, determined that Lukie failed to present a comparator in support of her discrimination claims, and that her retaliation claim failed because she was unable to establish a causal connection between her complaints and departure from the company. Further, the court found Lukie had not overcome MetLife's proffered non-pretextual reasons for its employment decisions. After careful review of the record, and with the benefit of oral argument, we affirm.

## I.    FACTUAL BACKGROUND & PROCEDURAL HISTORY

Lukie began working for MetLife's internal audit department in 2007 in the company's Morristown, New Jersey, location as an Assistant Vice President. In 2011, the company transferred her to the Enterprise Risk Management group and promoted her to the

position of Vice President of Regulatory and Model Risk, MetLife Investment Management Risk ("MIM Risk"), and Operational Risk. Lukie maintained her position as vice president in the Risk Management group from 2011 until her departure in May 2017. Lukie reported to three supervisors at different periods throughout her tenure as vice president: a woman named Lori Evangel, a man named Frank Cassandra, and another man named Graham Cox. Under each supervisor, Lukie was the only female vice president.

Throughout her career at MetLife, Lukie received high performance reviews. While under Cassandra's supervision, Lukie received written evaluations describing her as "absolutely critical" to the department's operation and "extremely knowledgeable, always professional, very organized, [and] focused." Similarly, Cox described Lukie as "very diligent," "conscientious," and a "good" performer.

Lukie, however, painted a less stellar picture of her time at MetLife. She alleged that, prior to her 2011 promotion to vice president, she was subjected to sexist comments from male co-workers. One stated, "is that a banana in my pants or am I just happy to see you;" another, while discussing two pregnant women who were about to go out on maternity leave, instructed Lukie to "tell the women in Investments to keep their legs crossed" and also called her a "cougar;" and yet another male co-worker instructed Lukie to "bake a cake in the oven" and "sort the fruit."

Following her 2011 promotion, Lukie did not allege further sexist comments, but complained of gender discrimination in the

form of pay gaps and "administrative" work assignments. Lukie contended that Cassandra often assigned her low-level administrative tasks such as typing up meeting agendas, taking notes during meetings, assembling slides, and organizing PowerPoint presentations, all tasks which Lukie believed were the collective responsibility of Cassandra's direct reports or the responsibility of Lukie's male coworkers, and yet the work was not distributed to other employees.

In 2014, Lukie complained to Cassandra about having to do what she considered to be administrative tasks on behalf of her male colleagues, and that these duties were outside of, and more menial, than her job responsibilities. Lukie maintained Cassandra never addressed her concerns regarding the assignment delegations. She thus resorted to elevating her complaints to Stan Talbi, a more senior executive. At this time, Lukie contemplated resigning from MetLife because of the increased "administrative" tasks but continued her employment in reliance on Talbi's assurances that "things would be getting better."

Nevertheless, Lukie contends the number of administrative tasks she was assigned increased, which she attributed to her placement under a new supervisor: Cox. Cox supervised Lukie from April 2016 until her departure in May 2017. Cox, like Cassandra, required Lukie to complete administrative tasks, such as attending senior leadership meetings to take notes, compiling reports, creating PowerPoints, spell-checking documents, and editing "fonts or colors." Lukie alleged that she continuously complained to Cox

and others that the tasks were "time-consuming, administrative, and . . . [not her] responsibility" to no avail. The true consequence, she asserts, was the retaliation she experienced in April and May 2017—Cox removed one of Lukie's direct reports and permanently removed her from working with the asset management division, which the company called MetLife Investment Management Risk. Cox reassigned Lukie's former MIM responsibilities to Scott Orr, a male colleague whom Lukie claimed had "zero necessary experience," and placed Lukie over project management with a different direct report.

Conversely, Cox alleged the first time Lukie complained of what she called the "administrative" tasks was in May 2017, only after Cox made the decision to switch her job duties and reassign one of her direct reports. Cox claimed he decided to make these changes following Lukie's voluntary relocation to MetLife's Tampa, Florida, office. Cox believed the direct report in New Jersey that performed the MIM tasks would benefit from a supervisor that was physically present in New Jersey. On May 9, 2017, after learning that her MIM duties were removed, Lukie sent an email to Cox resigning from MetLife.

Notably, Lukie attempted to resign from MetLife at least two times prior, but each time Cassandra or Cox convinced her to stay at the company. Lukie stated that she continuously resigned because "the administrative aspect" and "nature of the position required [her] to work excessive hours, nights, weekends and holidays." Lukie revealed a similar sentiment in a December 2016

email to a friend, in which she typed that she had "worked at night" to get some changes completed for MetLife and had "not really eaten in days."

Also, during the 2016 to 2017 period, Lukie was a victim of domestic abuse. Cassandra and Cox were aware of her domestic abuse struggles, which seemed to influence Cassandra's decision to approve Lukie's transfer to Florida and encourage her to stay with the company. While at least one of Lukie's resignations was prompted by "personal reasons," she ultimately resigned because of her belief that her role was "diminished," and she was "left . . . with administrative work."

On March 18, 2020, Lukie sued MetLife for sex discrimination, sexual harassment, and retaliation under the FCRA. In addition to referencing the sexist comments and administrative work assignments discussed above, Lukie also raised allegations of discriminatory pay. Lukie named Scott Orr, Jim [James] Dingler, Howie Kurpit, and Rob Semke as male comparators. Orr was Vice President of Market Risk and Derivatives; Dingler was Vice President of Credit Risk; Kurpit was Vice President of Economic Capital; and Semke was Vice President of Operational Risk and Governance.

Lukie asserted the only difference between her and her male comparators was "the name of the 'department' [they] oversaw and the fact that [she] was a female." Lukie had a Master of Business Administration (MBA) and was a Certified Public Accountant; in 2017, MetLife paid her an annual salary of $259,000. Orr had a

master's degree in operations research and financial engineering and was an actuary; in 2017, MetLife paid him an annual salary of $340,000. Kurpit was an actuary; in 2017, MetLife paid him an annual salary of $304,000. Semke did not have advanced credentials; in 2017, MetLife paid him an annual salary of $275,725.[1]

Following discovery, MetLife moved for summary judgment on Lukie's claims. MetLife asserted that Lukie failed to allege adequate comparators to substantiate her pay discrimination claim. According to MetLife, the other employees were not similarly situated to her in all material respects because they held additional credentials and were responsible for tasks that were not comparable to those assigned to Lukie. MetLife noted that, in her deposition, Lukie admitted that the comparators all had "different areas of expertise," that Dingler worked in the Investments group, and that Kurpit was a senior vice president who "did 'risk for EMEA.'"

As to Lukie's role in MIM Risk, MetLife argued that she only spent a small portion of her time working in that area, as her direct report in New Jersey performed the bulk of the MIM Risk work. MetLife emphasized that Lukie requested to be transferred from the New Jersey office to the Florida office and, as a result, the company recruited a former MetLife employee, Scott Orr, to return to the New Jersey office. MetLife stated that other than transferring

---

[1] Lukie did not present credential or compensation information for Jim Dingler.

the one MIM Risk duty to Orr, Lukie's responsibilities remained the same.

In response, Lukie opposed MetLife's request for summary judgment and attempted to substantiate and rationalize her selection of similarly-situated comparators and her theory of retaliation. She contended that the named comparators were similarly situated because they "were all at the same Vice President level, reporting to the same Executive." Regarding her retaliation claim, Lukie further contended that the removal of her MIM responsibilities was retaliation for her complaints surrounding the administrative work.

Ultimately, the district court granted MetLife's motion for summary judgment on all claims. Lukie appeals.

## II.    STANDARD OF REVIEW

We "review a summary judgment ruling de novo, viewing the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1299 (11th Cir. 2018) (citation and internal quotation marks omitted). Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

### III.    DISCUSSION

Lukie challenges the district court's ruling as to three of her claims: sex discrimination based on disparate pay, sex discrimination based on unequal assignment of administrative tasks, and retaliation.  We address each claim in turn.

> A.    *The district court correctly determined that Lukie failed to proffer proper comparators for her discriminatory pay claim.*

We first conclude that the district court properly granted summary judgment to MetLife on Lukie's claim of unequal pay based on sex because she failed to identify proper comparators. The FCRA prohibits employers from discriminating against employees because of their sex.  *See* FLA. STAT. §§ 760.01(2), 760.10. FCRA discrimination claims are analyzed using the same analytical framework and burdens of proof as claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2.  *See Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998); *see also Joshua v. City of Gainesville*, 768 So. 2d 432, 435 (Fla. 2000) (stating that the FCRA's purpose and construction were modeled after Title VII).

This Court uses the burden-shifting framework set forth in *McDonnell Douglas* to evaluate claims based on circumstantial, rather than direct, evidence of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272–73 (11th Cir. 2002).  This analysis requires that a plaintiff establish a *prima facie* case of discrimination, and if

the defendant proffers a legitimate, non-discriminatory reason for its actions, that the plaintiff then show that the explanation was pretextual. *Joe's Stone Crabs*, 296 F.3d at 1272–73.

To make out a *prima facie* case of discrimination, a plaintiff must show that: (1) she was a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the job; and (4) her employer treated similarly-situated employees outside her protected class more favorably. *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (*en banc*) ("*Lewis I*").

To meet the fourth prong, a comparator must be "similarly situated in all material respects," meaning that the plaintiff and the comparator must be "sufficiently similar, in an objective sense" and "cannot reasonably be distinguished." *Id*. at 1218, 1228 (citation and internal quotation marks omitted). This standard requires a case-by-case analysis and will not depend on labels but rather on substantive likeness. *Id*. at 1227–28. Further, minor differences in job functions between a plaintiff and a comparator will not be dispositive as to whether they are similarly situated. *Id*. However, a similarly-situated comparator will ordinarily: have engaged in the same basic conduct as the plaintiff; been subject to the same employment policy; had the same supervisor; and shared the plaintiff's employment or disciplinary history. *Id*.

Here, Lukie alleges MetLife paid her less than her male colleagues who worked in the same position and performed fewer duties. Lukie identifies Semke, Kurpit, Dingler, and Orr as

comparators. Although Lukie argues that she and her male colleagues were similarly situated in all material respects, the record before us does not support this finding.

The pay gap between Lukie and the named individuals is, on its face, significant when considering her superior performance reviews. However, the named comparators worked in different groups, held different credentials, and in some instances held higher titles than Lukie.

Lukie acknowledged that both Orr and Dingler worked with investments, which is distinct from the Risk Management work she performed. Lukie further acknowledged that employees who work with investments and employees who are actuaries are on a "higher [pay scale] than the corporate pay scale that [she] was on." She neither worked with investments nor was she an actuary. Given Lukie's concession that Orr and Dingler worked within a group that performed different tasks and were compensated under a different pay scale, neither Orr nor Dingler are proper comparators. Additionally, Orr was an actuary—which Lukie was not—further rendering him too dissimilar to be a proper comparator.

With respect to Semke, Lukie was unable to describe his daily tasks and responsibilities but acknowledged that his work—assessing or managing risk for EMEA—was not the same as hers, and although they were on the same management level, they had different jobs. Kurpit, in turn, was a senior vice president, while Lukie was a lower tier vice president. The difference between Semke's job duties and Lukie's job duties makes him an improper

comparator, while Kurpit's higher title makes him an improper comparator.

Considering Lukie's own admissions that the named comparators worked in different divisions, maintained different credentials, and were on different pay scales, the district court properly granted summary judgment for MetLife on Lukie's discriminatory pay claim.

B. *The district court correctly determined that Lukie failed to establish sexual discrimination based on being assigned administrative tasks.[2]*

Next, we conclude that the district court properly granted summary judgment for MetLife on Lukie's discriminatory assignment of tasks claim because Lukie did not show that those assignments constituted adverse employment actions.

Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). In *Muldrow v. City of St. Louis*, the Supreme Court held that, in a Title VII anti-discrimination case, a plaintiff does not need to show a "significant" or "serious" adverse employment action. 601 U.S. 346, 350, 353 (2024). However, the plaintiff must establish that the employer's actions

---

[2] The Court observes that Lukie did not allege sex discrimination based on unequal assignment of administrative tasks in her Complaint. Although MetLife raised this argument during summary judgment, the district court did not address that argument and analyzed this separate theory of relief. On appeal, Appellee has not argued that the district court erred in this respect.

"brought about some 'disadvantageous' change in an employment term or condition." *Id.* at 354 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). So, Lukie bears the initial burden of proving that MetLife's assignment of administrative tasks "left her worse off," even if not "significantly so." *Id.* at 359. As we have recognized in other unpublished opinions, the legal standard set forth in *Muldrow* altered our existing Title VII case law. *See West v. Butler Cnty. Bd. of Educ.*, No. 23-10186, 2024 WL 2697987, at *2 (11th Cir. May 24, 2024) (unpublished); *Davis v. Orange County*, No. 23-12759, 2024 WL 3507722, at *3 (11th Cir. July 23, 2024) (unpublished). Although the district court analyzed Lukie's claim under our pre-*Muldrow* precedent, we do not remand this case on that basis because the assignment of the particular administrative tasks at issue did not change in any disadvantageous way the terms and conditions of her employment.[3]

Lukie alleges that her MetLife supervisors targeted her, as the only female vice president at the time, for performance of lower-level tasks best suited for administrative assistants, which ultimately diverted her attention from her job duties. It is unclear whether the tasks Lukie pinpoints—taking notes during meetings, assembling slides, and organizing PowerPoint presentations—are clearly designated as her duties within her job description. What is clear is that Lukie believed that these tasks were not within her

---

[3] *See Fla. Wildlife Fed'n Inc. v. U.S. Army Corps of Eng'rs*, 859 F.3d 1306, 1316 (11th Cir. 2017) ("We may affirm the district court's ruling on any basis the record supports.").

duties and that she was subjected to performing them based solely on her gender.

While, historically, higher percentages of women than men within the workforce have been confined to occupying clerical roles, Lukie fails to demonstrate how the tasks she was asked to perform in these high-level corporate meetings were outside the terms and conditions of her employment. Lukie herself testified that the administrative assistants "did not have the skill set" to do some of the clerical tasks of which she complained. Nor did the assignment of these tasks prevent Lukie from receiving positive reviews on all aspects of her job responsibilities, salary increases, and bonuses.

Lukie tries to substantiate her claim that she was assigned administrative tasks based on her gender by identifying male employees she alleges were not assigned similar tasks. However, as discussed above, those male employees are not suitable comparators, so the record does not support finding that the work she performed was outside of *her* job duties. As such, the district court properly granted summary judgment to MetLife on Lukie's discriminatory assignment of administrative tasks claim.

C.      *The district court correctly determined that Lukie failed to establish a prima facie retaliation claim.*

Finally, we conclude that the district court correctly found that Lukie failed to prove MetLife's actions in removing her MIM Risk responsibilities constituted retaliation. Absent direct evidence of retaliation, the first step of the *McDonnell Douglas* burden shifting

framework for a plaintiff asserting a retaliation claim under the FCRA is to establish a *prima facie* case by showing that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 & n.4 (11th Cir. 2010).

To demonstrate a causal connection, the plaintiff must show that (1) the decisionmakers knew of her protected activity, and (2) the protected activity and adverse action were not wholly unrelated. *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). The causal link element is construed broadly, and a plaintiff merely must show that the protected activity and the negative employment action are not completely unrelated. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). Ultimately, however, the employee must prove that "the desire to retaliate was the but-for cause of a challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

"Close temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (citation and internal quotation marks omitted). The temporal proximity must be very close, however, if the plaintiff lacks other evidence of causation. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). A three-to-four-month delay between the protected activity and the

adverse action, standing alone, is insufficient to show a causal connection. *Id.* Absent "other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id.* In a retaliation case, when an employer contemplates taking a materially adverse action before an employee engages in protected activity, "temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006).

Here, Lukie argues that she engaged in protected activity when she raised her complaints about the assignment of administrative tasks which closely preceded the removal of her MIM Risk duties and reassignment of them to Orr. She alleges this constitutes retaliation. However, Lukie fails to demonstrate the causal connection between her complaints and the removal of her MIM Risk duties. Where no other evidence of causation exists, temporal proximity, if very close, can show causation. *Thomas*, 506 F.3d at 1364.

Lukie contends she first filed complaints with Cassandra as early as 2014, and later with Cox beginning in 2016. MetLife removed Lukie's MIM Risk responsibilities in April 2017. Without other evidence of causation and a lack of evidence showing a close temporal proximity between the complaints and actions taken regarding her MIM Risk duties, Lukie cannot establish causation.

22-10967            Opinion of the Court            17

Further, in defense of its decision, MetLife cited legitimate, nonretaliatory business reasons—the need for an in-person MIM Risk supervisor in the New Jersey office. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). To show pretext, a plaintiff must show the employer's "proffered reason was not the true reason for the employment decision" and may succeed by showing the "proffered explanation is unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks omitted) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). MetLife maintains Orr assumed the MIM Risk role after Lukie moved to Florida because they felt the employees in the New Jersey office would benefit from being in the same office as their supervisor, and that Orr's quantitative background would be beneficial for the role. Although Orr's "quantitative approach" or actuary status may not have been necessary for the MIM Risk role, MetLife's explanations were not so implausible that a reasonable factfinder would find them unworthy of credence. *Id.* Lukie cannot show that these reasons were pretextual—she fails to identity any signs of animus or forewarnings of potential retaliation that would discredit the legitimate reason MetLife submitted for removing her MIM Risk responsibilities. Further, although the district court did not expressly address the existence of but-for causation, it does not appear that Lukie met that standard based on the foregoing. *Nassar*, 570 U.S. at 352.

As part of Lukie's retaliation claim, she unsuccessfully alleges constructive discharge. "Constructive discharge occurs when

an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (citation and internal quotation marks omitted).  Although Lukie introduced evidence of coworkers making harassing or offensive comments related to her sex, these comments alone are insufficient evidence of her employer promoting a workplace that encouraged or tolerated this conduct.  Therefore, it was reasonable for the district court to find that someone in Lukie's position, *i.e.*, a vice president with a sizeable salary in charge of multiple employees, would not have felt compelled to resign due to being assigned administrative tasks during meetings where only mid-level and senior executives were invited.  Thus, the court correctly held that the evidence did not suggest that Met-Life made her working conditions so unbearable or intolerable that a reasonable employee would be forced to quit.

> D.　　*The district court correctly determined that Lukie failed to establish a "convincing mosaic" of circumstantial evidence.*

Other than a simple line in its opinion rejecting Lukie's convincing mosaic argument, the district court did not conduct any analysis of her circumstantial evidence.  However, the record is sufficient for us to evaluate the merits of Lukie's argument.

Even if a plaintiff fails under *McDonnell Douglas*, she may establish a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination" by pointing to evidence that demonstrates (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may

be inferred; (2) systematically better treatment of similarly-situated employees; and (3) pretext. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*") (citation and internal quotation marks omitted).

Regarding Lukie's discrimination claims based on disparate pay, because she did not present any evidence of suspicious timing, ambiguous statements, superior pay of similarly-situated employees, pretextual reasons for the determination of her salary, or other information from which discriminatory intent could have been inferred, she did not present a "convincing mosaic" of discrimination as it relates to pay. *Id.*

Further, to prove that an employer's explanation is pretextual, an employee must cast enough doubt on its veracity that a reasonable factfinder could find it "unworthy of credence." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (*en banc*) (citation and internal quotation marks omitted). Here, Lukie presented no evidence to demonstrate that any of MetLife's justifications for higher compensation for employees who were actuaries or employees who led different groups were pretextual. *See id.* Thus, the district court properly granted summary judgment to MetLife on her sex discrimination claim as to unequal pay.

As to Lukie's claim of sex discrimination based on unequal assignment of administrative tasks, she similarly failed to demonstrate MetLife systematically treated similarly-situated employees outside of her class better. *See Lewis II*, 934 F.3d at 1185. Lukie only offers that she was unhappy with the assignment of administrative

tasks and that she complained to her supervisors to no avail. Thus, she failed to offer evidence of suspicious timing, ambiguous statements that were made in the assignment delegation, or other information to allow an inference that MetLife's justifications for assigning administrative tasks to her were pretextual.

Finally, Lukie fails to proffer sufficient evidence for her claim of retaliatory intent. A plaintiff's claim of retaliation can survive summary judgment if she presents a "convincing mosaic" of circumstantial evidence that would permit a reasonable inference of retaliatory intent. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023). However, Lukie is neither able to refute the legitimate non-discriminatory reasons promulgated by MetLife for removing her direct report and reassigning her MIM Risk duties after her move to Florida, nor show evidence capable of creating an inference of MetLife's retaliatory intent.

In sum, because Lukie did not present a "convincing mosaic" of circumstantial evidence of sex discrimination nor retaliation, neither an inference of intentional discrimination nor retaliatory intent can arise.

## IV.    CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment in favor of MetLife.

**AFFIRMED.**